# EXHIBIT A

FILED
2/21/2024 7:39 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L002016
Calendar, H
26506545

FILED DATE: 2/21/2024 7:39 PM   2024L002016

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

|  |  |  |
|---|---|---|
| ADRIAN SANTIAGO, | ) | |
| | ) | |
| | ) | |
| | ) | Case No. |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NORTHWESTERN UNIVERSITY, JAMES | ) | JURY TRIAL DEMANDED |
| THOMAS FOSTER, MONIQUE HOLLAND, | ) | |
| AND RACHEL VELEZ, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Adrian Santiago ("Santiago"), by and through his undersigned counsel, Esbrook P.C., for his complaint against Defendants Northwestern University ("Northwestern"), James Thomas Foster ("Foster"), Monique Holland ("Holland"), and Rachel Velez ("Velez") (collectively "Individual Defendants", and together with Northwestern, "Defendants") state as follows:

## NATURE OF THE ACTION

1.     This action arises out of Northwestern and the Individual Defendants' collective failure to address the sustained environment of toxicity, abuse, and harassment that the Plaintiff suffered throughout the 2022–2023 baseball season at Northwestern—particularly at the hands of Northwestern's former Head Baseball Coach, Jim Foster.

2.     Northwestern's negligent hiring of Foster, as well as the Defendants' continued failures to stop the mistreatment of its employees and students by Foster, are well-documented. Despite the Plaintiff repeatedly telling the Defendants, including numerous staff members within

FILED DATE: 2/21/2024 7:39 PM    2024L002016

its Athletic and Human Resources ("HR") departments, about the abusive, toxic, and dangerous environment created by Foster, the Defendants continued to protect Foster rather than its staff and student-athletes.

3.      The negligent hiring of Foster and the outrageous mishandling of the investigation into Foster's misconduct after he was hired led to Christopher M. Beacom ("Beacom"), Michael Dustin Napoleon ("Napoleon"), and Jonathon R. Strauss ("Strauss") being stripped of their coaching titles and assigned remote contract work to avoid early termination of their employment at Northwestern.

4.      As a result, the Plaintiff was forced to pick up the work of three vacant positions with little to no compensation and to continue to suffer severe and extensive emotional distress arising from Foster's ongoing, well-known, toxic behavior.

5.      Northwestern not only breached its obligations to compensate the Plaintiff properly, but is further liable to the Plaintiff for the negligent hiring and supervision of Foster and the negligent and intentional infliction of emotional distress on the Plaintiff. Additionally, given Foster's own illegal and tortious conduct, Northwestern is also liable for the acts of Foster, its former employee, through the doctrine of *respondeat superior*.

## **PARTIES**

6.      Santiago resides in St. Louis, Missouri. He is the former volunteer Assistant Baseball Coach at Northwestern.

7.      Northwestern is a comprehensive research university with its principal place of business located at 633 Clark Street, Evanston, IL 60208.

8.      On information and belief, Foster is an Illinois resident. He is the former Head Baseball Coach at Northwestern.

FILED DATE: 2/21/2024 7:39 PM   2024L002016

9.      Holland is an Illinois resident. She is currently Deputy Director of Athletics (Chief of Staff) at Northwestern.

10.     Velez is an Illinois resident. She is currently Associate A.D. for Human Resources at Northwestern.

## JURISDICTION AND VENUE

11.     Jurisdiction is proper in this Court under 735 ILCS 5/2-209 because Northwestern's principal place of business is in Cook County, Illinois, and because the Defendants transact business within Illinois, have committed tortious conduct in Illinois, make and perform contracts substantially connected to Illinois, and maintain continuous and systematic contacts in Illinois.

12.     Venue is proper in Cook County, Illinois, under 735 ILCS 5/2-101 because Northwestern's principal place of business is in Cook County, Illinois and the facts and circumstances giving rise to the claims asserted herein occurred substantially in Cook County, Illinois.

## FACTS

### *Foster's Alarming Reputation Rings True at Northwestern.*

13.     In June 2022, Northwestern hired Foster as Head Baseball Coach.

14.     Northwestern invited Foster to leave Army West Point after six years—with an established and well-known reputation as a bully—to join Northwestern.

15.     Northwestern hired Foster despite his departure from Army West Point for allegations of abuse and misconduct made against him by student-athletes at Army West Point, allegations that were apparent upon a proper investigation and vetting of Foster prior to his being hired by Northwestern.

FILED DATE: 2/21/2024 7:39 PM    2024L002016

16.     As Head Baseball Coach, Foster had full autonomy over the baseball program, including the authority to fire personnel, approve sick leave, and, generally, handle all baseball program business.

17.     From the very beginning of Foster's tenure at Northwestern, the Plaintiff and other staff were subjected to abuse and bullying by Foster while Northwestern continued to protect Foster—above the baseball staff, its student-athletes, and even its recruits. Specifically:

a.  Foster exhibited volatile, unpredictable behavior with frequent blow-ups. On October 22, 2022, at the baseball program's "Pro Day"—an event where baseball scouts visit Northwestern to assess talent and professional athletes previously associated with the baseball program partake in alumni activities, Foster publicly berated the Plaintiff in front of these visitors, telling him to "shut the fuck up" when announcing players to hit or pitch.

b.  On or around November 15, 2022, when recruiting an African American player, Foster asked the staff: "If the kid was white, would you recruit him?" While the staff responded that they would, Foster stated that he would not.

c.  Foster frequently yelled at staff members in profanity-laced tirades. For example, in response to the Plaintiff politely and professionally voicing his opinion on topics being discussed by the coaching staff, Foster was unprofessional and demeaned the Plaintiff on numerous occasions. For instance, on or around November 16, 2022, the Plaintiff asked Foster about recruiting obligations due to imminent changes in the NCAA rules for volunteer coaches and was told: "You have a fucking facility right there go use it . . . I had a kid in 1994 and made $4,000.00 for the year and made it work. Figure it out." When Napoleon attempted to move forward with the

4

FILED DATE: 2/21/2024 7:39 PM    2024L002016

discussion by rescheduling the meetings, Foster yelled at Napoleon to "sit the fuck down because we [aren't] finished." Foster also yelled at Plaintiff, "do you have anything fucking else to say?" and to "shut the fuck up" then continued the meeting as if nothing had occurred.

d.   On or around November 23, 2022, Foster attempted to manipulate and pit staff against one another, including in one conversation telling Plaintiff not to become close with Strauss, Beacom, and Napoleon, all of whom had seemingly fallen out of favor with Foster, because "those guys could dig their own graves if they wanted."

e.   On March 30, 2023, during a moment in which Plaintiff did not have his laptop opened on a bus ride to West Lafayette, Indiana, Foster yelled at Plaintiff to "wake the fuck up and get to work." Foster yelled this in front of the team, student manager, and Mark Wesoloski ("Wesoloski"), Associate A.D. for Ticket Operations and Sports Administrator.

f.   On April 4, 2023, Foster exhibited extreme paranoia before Plaintiff and the team boarded a bus to play Notre Dame. Foster asked Plaintiff to confirm that the families of players committed to joining Northwestern's team had tickets to attend the upcoming weekend games. When Plaintiff started to work on the tickets using his phone, Foster told him to "put [his] fucking phone away" and berated him for focusing on recruiting. Afterward, the team loaded the bus and Plaintiff stepped off to ask Wesoloski to upload the tickets to the team's software. When Plaintiff returned onto the bus, he was repeatedly asked by Foster what he was discussing with Wesoloski. Instead of accepting the clear-cut answer—tickets for committed

FILED DATE: 2/21/2024 7:39 PM    2024L002016

players and their families—Foster told Plaintiff to "get off the bus" and proceeded to scold him in front of Wesoloski. Foster was concerned that Plaintiff was complaining to Wesoloski about his behavior. When Wesoloski confirmed the topic of conversation related to tickets, Foster stated "it's my ass on the line, I just want to make sure the kids are taken care of." Wesoloski observed Foster's treatment of the staff and student-athletes throughout the season—and did nothing.

18.     Foster also repeatedly asked staff members to violate NCAA rules, such as contacting and meeting with underage potential recruits and conducting unofficial visits, including:

a.  On November 4, 2022, a player for the 2025 recruiting class attempted to participate in an official visit. The player stated that he was invited to the visit by Foster—despite such an invitation being a clear violation of NCAA rules. Napoleon and Strauss asked the individual and his father to leave.

b.  On November 5, 2022, the same player from the 2025 recruiting class attempted to attend a breakfast for potential recruits. Again, he stated that he had learned of the breakfast from Foster. Once again, Napoleon and Strauss asked the individual to leave.

c.  On March 2, 2023, during a 4-hour bus ride from Dallas/Fort Worth International Airport to Ruston, Louisiana, Foster received an email from Spencer Dawson ("Dawson"), Director of Compliance, informing him that Northwestern was self-imposing sanctions for NCAA recruiting violations. Since Dawson's email listed names of players that Foster previously provided to Plaintiff for purposes of reviewing them for prospective recruitment, Foster turned to Plaintiff and asked

him "how the fuck did they get these names." Foster stated that "this [was] his ass on the line" and "this [was] messing with food on [his] table." Plaintiff responded that he was unaware of how Northwestern's Compliance department received the names—resulting in Foster continuing to harass and yell at Plaintiff about "how the fuck they got this stuff." Not only did Foster repeatedly question Plaintiff about the player names for the entirety of the bus ride, but he continued to interrogate and harass Plaintiff about the information over the following months despite knowing that Santiago was not allowed to speak about the investigation being conducted by HR and Compliance.

***The HR Investigation***

19. As a result, in or around October 2022, Beacom, Napoleon and Strauss began the process of formally reporting Foster's misconduct to Northwestern. Beacom, Napoleon, and Strauss also informed HR that they had separately reported Foster to the NCAA for various NCAA violations.

20. In or around January 2023, Plaintiff met with Kevin Clark ("Clark") and Rachel Velez ("Velez") from HR to corroborate the timeline that Beacom had provided in the investigation. At that time, Plaintiff informed Clark of his experience with Foster, including how his manipulative behavior gave him extreme anxiety. Plaintiff specifically told Clark that Foster was driving the baseball program into the ground and that no staff would remain if Northwestern did not make a change. Northwestern disregarded Plaintiff's comments and no change was made.

FILED DATE: 2/21/2024 7:39 PM    2024L002016

21.     While Beacom, Strauss, and Napoleon began the process of reporting Foster's behavior to Northwestern, Foster exploited Plaintiff's position as a volunteer coach.[1] For example:

a.  On or around December 15, 2022, Foster texted Plaintiff that he "[had] a check for [him], $1000 for Christmas so that [he could] buy presents for [his] girlfriend." The $1,000 "gift" was in fact an advance deducted from Plaintiff's work at a December 26–29, 2022 youth camp. Plaintiff was not aware of this payment structure until January 3, 2023, when his check was for $1,000 less what he was owed.

b.  Plaintiff was required to report any financial losses to Northwestern when working camps. When Foster's wife gave a family friend a camp discount, Foster attempted to prevent Plaintiff from reporting the loss to Northwestern, stating: "Oh, they'll pay us back." Northwestern requested information about the discount and Foster blamed his wife.

c.  Foster often complained to Santiago and a student manager about the other coaches, stating that Napoleon and Beacom were "useless" and not doing their jobs. Meanwhile, Foster did not set up for camps, missed practices, and even went as far to miss a January 14, 2023 visit with professional athlete alumni.

22.     Plaintiff made numerous attempts to inform Velez about what was happening with the team and the negative impact of Foster's behavior.

---

[1] "The daily grind for volunteer assistant coaches can consist of extensive hours at the field or in the office, but their day doesn't end once they leave . . . . 'These guys are working full-time, 40-60 hours per week, and are unpaid. The money they receive comes from camps[]' . . . . [E]ven [the] extended hours for additional income outside of their coaching jobs don't help the volunteers live paycheck to paycheck or afford their rent in the areas they live." https://www.prospectslive.com/prospects-live/2021/12/6/the-life-of-volunteer-assistant-coaches. In November 2022, former Division I volunteer baseball coaches filed a lawsuit in the Eastern District of California "alleging the NCAA illegally limits not only the number of paid baseball coaches a team can hire, but also illegally price fixes a volunteer coach's salary at zero." https://frontofficesports.com/smart-v-ncaa-lawsuit/. In January 2023, the NCAA Division I Council "announced the incorporation of a third full-time assistant to college baseball staffs across the country, ending a bitter battle between volunteer coaches and the NCAA." https://www.baseballjournal.com/ncaa-d1-change-third-assistant-coach-can-now-be-paid/.

FILED DATE: 2/21/2024 7:39 PM    2024L002016

23.     For instance, on March 13, 2023, the Plaintiff told Velez that he was "super frustrated with everything that's going on [at Northwestern] and sometimes [he] just can't keep not saying anything or holding it in or taking it home" to which Velez responded that "[i]t's okay, [she] signed up for this and offered it to [him]. And [she stood] by that." Velez once again confirmed on March 17, 2023 that she could "handle being the one [he] vent[ed] to or [got] frustrated with". As a result, the Plaintiff continued to inform Velez of the team environment and Foster's behavior, including on or around March 30, 2023, when he texted Velez that he was "[w]earing 3 different hats at once right now" and "[a]lso training a coach that's never written a scouting report or used team works or excel so".

24.     Still, Northwestern did nothing.

25.     Dr. Derrick Gragg ("Dr. Gragg") and Monique Holland ("Holland") remained completely uninvolved until a physical altercation almost occurred between Foster and Strauss. When Strauss complained to Holland that she was not protecting the staff and student-athletes, Holland told him to "grow up" and to respect Foster's authority.

26.     Holland refused to meet with any of the coaches individually except for Foster, who often used Holland as a conduit to communicate with staff.

27.     On February 15, 2023, Foster realized that Napoleon was taking personal leave. Foster told the team on February 16, 2023, when the team was heading to the airport. Upon arrival at the airport, Foster told Plaintiff that Strauss and Beacom were rude at the meeting, and he would have liked to "drag their asses through the glass windows" of the Mogentale Players Lounge. Despite an administrator, Holland, being assigned to attend and monitor this trip, she was not around at the time Foster made this statement. Holland was only present on Friday, February 17.

28.     By February 18 and 19, 2023, after Holland left the trip, all hell broke loose in a dugout during a game. Foster would not allow Strauss to pull a pitcher who was over his pitch count. Foster demeaned Plaintiff, telling him, "I don't need a fucking referee" and to "mind your fucking business" when Plaintiff sought to defuse a heated exchange between Strauss and Foster. Foster removed Strauss from his role of managing pitchers and two days later both Beacom and Strauss were no longer with the team.

29.     That same day, Dr. Gragg confirmed that none of the three *paid* members of the baseball staff would be returning to the team and that Northwestern was in the process of hiring new coaches.

30.     In fact, Beacom, Strauss, and Napoleon became remote special contract workers at Northwestern in order to receive compensation for the remainder of their contracts. These dedicated members of the University ultimately lost their positions at Northwestern in June 2023 while Foster remained Head Baseball Coach.

***Plaintiff is Forced To Undertake Three Jobs Without Proper Compensation***

31.     On or around February 23, 2023, Northwestern sent a letter to Beacom, Strauss, and Napoleon that summarized the outcome of an HR investigation and confirmed that Foster had engaged in conduct that violated university policy. In particular, the university found sufficient evidence to substantiate allegations that Foster engaged in bullying and abusive behavior.

32.     Despite Northwestern having confirmed the allegations of Foster's bullying, derogatory comments, and toxicity in the workplace, it opted to support Foster as Head Baseball Coach for the entirety of the 2022–23 baseball season, thereby endorsing his outrageous conduct and leaving Plaintiff to bear the full extent of Foster's misconduct.

FILED DATE: 2/21/2024 7:39 PM    2024L002016

33.     Thereafter, Foster made explicit statements to the Plaintiff that he had the immediate opportunity to thrive as more than a volunteer coach with the team—and that he was intentionally still with the team. In particular, Foster assured the Plaintiff, "[w]e'd be great coaching together. If I didn't want you here, you wouldn't be here." Foster even stated, "[y]ou could be my first or second assistant."

34.     Foster also continued to manipulate the Plaintiff into handling the responsibilities of each of the staff members who were no longer active in the program (Beacom, Napoleon, and Strauss). In particular, Foster asked the Plaintiff to single-handedly manage program operations, pitching strategy, and recruiting. Each of these duties were previously handled by Beacom, Napoleon, and Strauss. With these three staff members no longer with the baseball program, the Plaintiff—still a volunteer—was left to shoulder the entirety of these duties *alone*.

35.     Plaintiff taking on every single responsibility of these former staff members meant that Foster had *one* person to bully and blame for anything and everything. For example:

   a.  On March 3, 2023, during a game in Louisiana, Foster stripped Plaintiff of all pitching coach responsibilities because the team was losing.

   b.  On March 10, 2023, during a game in St. Louis, Foster blamed Plaintiff for players being in the wrong position and told him to "shut the fuck up and bite his lip" if he tried to respond.

36.     Not only was this abusive treatment acknowledged by the student-athletes on the team and all remaining staff members, but it was even recognized by coaches on opposing teams. In fact, both former Northwestern coaches and coaches who had prior experience working with Foster called Plaintiff to provide him with advice and support.

***Plaintiff Requests Support But is Ignored***

11

FILED DATE: 2/21/2024 7:39 PM    2024L002016

FILED DATE: 2/21/2024 7:39 PM    2024L002016

37.     For his own sake and for the sake of the program, Plaintiff reported the abuse to Velez. Once again, Northwestern did nothing.

38.     Through all of this, Plaintiff remained a volunteer coach, while being fed assurances by Foster that Plaintiff could be hired next season.

39.     Finally, in March 2023, Plaintiff took the initiative to approach Foster and Northwestern about receiving pay for the three jobs he was now performing.

40.     Foster initially told Plaintiff that he "was caught up in administrative bullshit," while Velez told Plaintiff that they were "working it out" with the NCAA.

41.     From the very beginning of Plaintiff joining the team, Foster requested that Plaintiff contact coaches that Plaintiff was acquainted with in order to obtain lists of potential recruits that Foster could set-up phone calls with.

42.     Foster knew that, per then-current NCAA policies,[2] Plaintiff performing this particular function was prohibited.

43.     Nonetheless, in a written communication from Foster to Northwestern's HR department, Foster admitted that "all things recruiting [was] subpar, [but] the volunteer coach [was] doing more than half of it."

44.     Foster and Northwestern were well-aware that Plaintiff, at Foster's direction, was performing obligations beyond that of a volunteer coach under NCAA rules. It was incumbent

---

[2] Under the 2022-23 NCAA Division I Council Legislation, "a volunteer coach is any coach who does not receive compensation or remuneration from the institution's athletics department or any organization funded in whole or in part by the athletics department or that is involved primarily in the promotion of the institution's athletics program (e.g., booster club, athletics foundation association)." "The [volunteer coach] is prohibited from contacting and evaluating prospective student-athletes off campus and may not perform recruiting coordination functions." Section 11.01.6 of the 2022-23 NCAA Bylaws specifically outlines the role of volunteer coaches, including recruiting restrictions. *See* https://ncaaorg.s3.amazonaws.com/governance/d1/legislation/2022-23/2022-23D1GOV_POPL2022-23.pdf. The recent change by the NCAA to remove the volunteer coach position and increase the number of paid assistant coaches was made in-part to "increase the number of coaches who can assist with recruiting activities." *See* https://www.ncaa.com/news/ncaa/article/2023-01-11/ncaa-division-i-council-modernizes-rules-coaching-limits.

FILED DATE: 2/21/2024 7:39 PM   2024L002016

upon the university to immediately address and rectify this issue by reclassifying the Plaintiff as a "countable coach"[3] under NCAA bylaws. As a countable coach, the Plaintiff was due compensation for all of his work for the team.

45.     Foster and Velez ultimately determined that Plaintiff would only receive two payments of $5,000 on or around March 15 and April 15, 2023, for his performance of all three jobs—less than what any other coach or the Director of Operations made under their employment contracts.

46.     Additionally, Northwestern failed to compensate Plaintiff for the work that it knew he had been performing since coming on board as a volunteer coach—work that Northwestern and Foster assigned to a "volunteer" in direct violation of NCAA guidelines. This was done by Northwestern to avoid paying Plaintiff an assistant's salary as required for staff who are performing tasks only legally assignable to "countable coaches."

47.     When Plaintiff inquired about how Northwestern determined his compensation, Velez responded, "[t]hat is the rate [they] as an administration decided on taking into account a number of different factors" such as "experience, skill sets, budget, market, etc." Velez even specified that "[w]hat is budgeted is not always what's offered. And really salaries or stipends of others are personal matters."

48.     At a mere $5,000 paid on just two occasions, Northwestern then added *another* job responsibility onto Plaintiff's plate: training two new coaches with no collegiate coaching experience. This included teaching them how to use recruiting software and scouting technology.

---

[3] Notably, not only was Foster asking Santiago to complete recruiting tasks that are only authorized to be done by a "countable coach", but the task, in and of itself, was a violation of NCAA guidelines in that the types of calls that Santiago was being asked to facilitate were not authorized by NCAA rules.  This only further demonstrates the toxic and misguided program that Foster sought to run.

13

FILED DATE: 2/21/2024 7:39 PM    2024L002016

49.     Velez was fully aware of this situation, with Plaintiff telling her directly that he was "training a coach that's never written a scouting report or used teamworks or excel." Again, Northwestern did nothing.

50.     One of these new coaches, Brian Anderson, even told Northwestern that he was willing to forgo his monthly pay of $8,500 for Plaintiff since Plaintiff was the one training him. Yet, Northwestern refused to increase Plaintiff's second payment by a mere $3,500, instead maintaining his second—*and final*—payment at $5,000.

51.     In fact, as of the following month, Northwestern refused to pay Plaintiff even the $5,000 payment amount he had received in March and April 2023.

52.     Meanwhile, Plaintiff continued to handle each of his responsibilities—those of an NCAA "countable coach"—with no pay.   Even worse, the nature and amount of job responsibilities prevented him from working any baseball camps to supplement his nonexistent income.

53.     Northwestern failed to provide Plaintiff with an employment contract that paid him for his job responsibilities, instead, circumventing NCAA rules by improperly labeling him as a "volunteer" despite the multiple jobs he was performing. Northwestern then used the absence of an employment contract as an excuse to avoid providing Plaintiff with access to essential resources—resources that nearly all staff and members of the Northwestern community have access to.

54.     For instance, when Plaintiff asked Velez to see a therapist for extreme anxiety he was experiencing caused by Foster's abusive conduct, Velez said she would look into it. Plaintiff never heard back.

FILED DATE: 2/21/2024 7:39 PM    2024L002016

55. And because of his "voluntary" employment status, he was left out to dry with *no insurance* to cover fees needed to diagnose and treat the various mental health symptoms he was experiencing arising out of the toxic work environment created by Foster and Northwestern.

***Foster's False Promises***

56. At the end of the season, Foster communicated to Plaintiff that he could be the pitching coach moving forward. In fact, Foster explicitly told Plaintiff that he would be paid $100,000 as the pitching coach for the team.

57. Meanwhile, Foster proceeded to contact former coaches to offer up the same position of pitching coach and recruiting coordinator, despite promising those exact duties to the Plaintiff.

58. Foster's false promises were ultimately revealed when Plaintiff received a phone call from another candidate that Foster was recruiting inquiring as to why Foster would think this individual would be interested in that type of role at Northwestern. It was obvious that Foster had no intention of making the Plaintiff a pitching coach at Northwestern for the 2023–24 season.

59. Plaintiff could no longer endure such an abusive and toxic work environment. At the end of June 2023, Plaintiff told Foster that he was leaving the program.

60. Plaintiff also emailed Dr. Gragg, Holland, and Velez to inform them he could no longer work for Foster despite it being a "dream opportunity" to "represent [his] hometown school." In particular, Plaintiff informed them that, "[u]nfortunately, [he could not] work in the current environment and continually recruit kids . . . given how [he felt] about the direction [they were] going and not being able to get [himself] to sell a culture and vision of a head coach [he did] not believe in." While it was a tough decision "considering all [his] family [are] here in Chicago," his "mental and physical health are something that . . . had to take precedent."

FILED DATE: 2/21/2024 7:39 PM    2024L002016

61.     Afterward, Holland and Dr. Gragg met with the players, and to no one's surprise, the vast majority of players confirmed that they wanted Northwestern to fire Foster.

***Northwestern Finally Fires Foster***

62.     Northwestern finally decided to terminate Foster on July 13, 2023, three days after the highly-publicized firing of head football coach Patrick Fitzgerald with ensuing scrutinizing press coverage. Unfortunately, this was far too little, far too late. In the press release terminating Foster, Dr. Gragg stated as follows:

> "Nothing will ever be more important to Northwestern than providing its students a place that allows them to develop in the classroom, in the community, and in competition at the absolute highest level, and building a culture which allows our staff to thrive. This has been an ongoing situation and many factors were considered before reaching this resolution. As the Director of Athletics, I take ownership of our head coaching hires and we will share our next steps as they unfold."[4]

63.     Northwestern had every opportunity to do the right thing and actually "provide[] its students a place that allows them to develop in the classroom, in the community, and in competition at the highest level, and building a culture which allows [its] staff to thrive." It was warned about Foster repeatedly—both formally and informally—both before and after his hire.

64.     Northwestern was informed, on numerous occasions, and even via a formal HR complaint, of the incredibly detrimental impact Foster's presence was having on Northwestern's program and culture. Still, Northwestern did ***nothing***.

---

4    https://www.espn.com/college-sports/story/_/id/38007877/northwestern-fires-baseball-coach-jim-foster-sources-say.

FILED DATE: 2/21/2024 7:39 PM 2024L002016

65.     Dr. Gragg and the University were only forced to take action when these issues came to public light via multiple media outlets and litigation involving the Athletic Department.[5]

66.     As indicated by the twenty complaints—and counting—filed in Cook County, Illinois since the beginning of July 2023 in connection with Northwestern's football and volleyball programs, Northwestern has repeatedly demonstrated its failure to properly handle and resolve inappropriate and *harmful* conduct within its athletic community.[6]

67.     Northwestern has itself since recognized that the culture of its athletic department is severely damaged. On August 2, 2023, Northwestern took the drastic step of hiring former U.S. Attorney General Loretta Lynch to lead an investigation into the culture of its athletic department "following allegations of abusive behavior and racism within the football program and other teams."[7]

68.     Unfortunately, Ms. Lynch cannot undo the damage that has already been done.

69.     Plaintiff continues to suffer because of the detrimental impact of Northwestern's misconduct on his reputation and employment opportunities.

70.     Northwestern is a Division I, Big Ten university with highly coveted positions in its athletic department.  The Plaintiff was honored and excited to pursue his career as a top-talent baseball coach for such a reputable and impressive program.

71.     Instead, the Plaintiff has been irreparably harmed and must salvage his reputation after the dismal 2022–23 Northwestern baseball season with Foster.

---

[5] Unsurprisingly, recent filings in Cook County against Northwestern allege that Foster engaged in "bullying and abusive behavior towards students at Northwestern." *See, e.g.*, *John Doe 1 v. Northwestern University et al.*, Case No. 2023L007098, ¶ 35.
[6] *See* Circuit Court of Cook County, Illinois Case Nos. 2023L007098; 2023L007221; 2023L007226; 2023L007300; 2023L007396; 2023L007485; 2023L007499; 2023L007705; 2023L007707; 2023L007711; 2023L007712; 2023L007713; 2023L007898l; 2023L007904; 2023L007910; 2023L008183; 2023L008086; 2023L008858; 2023L008859; 2023L008860.
[7] https://apnews.com/article/loretta-lynch-northwestern-hazing-f8f19d4066e88bc7bf5705b42dae6e40.

72. As a result, the Plaintiff was forced to return to the Division III university where he worked prior to Northwestern and must rebuild his reputation.

73. The severe, adverse impact of Northwestern's misconduct has permanently stained Plaintiff's work experience and stalled the trajectory of his once-promising career as a talented Division I baseball coach.

74. Northwestern not only failed to pay Plaintiff what he is legally owed, but is liable for the negligent hiring and supervision of Foster, and negligent and intentional infliction of emotional distress.

### Count I – Illinois Minimum Wage Law
### (Northwestern)

75. Plaintiff incorporates and realleges the allegations of paragraphs 1 through 74 as if fully set forth herein.

76. Despite being misleadingly labelled by Northwestern as a "volunteer", the Plaintiff was an employee of the University who expected, and was due, proper compensation.

77. In particular, when the Plaintiff's job responsibilities and his duties vastly increased and expanded, he was assured that the University was looking into proper compensation for him.

78. In particular, the Plaintiff was asked by Foster to single-handedly manage program operations, pitching strategy, and recruiting—the responsibilities of *paid,* countable coaches. This scope of work was previously handled by three members of the team: Beacom, Napoleon, and Strauss.

79. Further, it was a violation of NCAA rules for the Plaintiff to perform certain functions as *just* a volunteer coach—he needed to be reclassified as a countable coach and employee of the University.

FILED DATE: 2/21/2024 7:39 PM  2024L002016

80.     Northwestern was aware that the Plaintiff was performing work far beyond that of a volunteer coach and simply assured him that the University was "working it out".

81.     Consequently, Plaintiff erroneously assumed the University would properly compensate him for his work as an employee at the University.

82.     Instead, Northwestern decided to compensate the Plaintiff a *total* of $10,000, which, when taking the time worked by Plaintiff into account, is far below the minimum wage per hour in Illinois of $12.00–$13.00.

83.     Additionally, the Plaintiff was not properly compensated for the entirety of his employment at the University, from October 2022 to June 2023, because Northwestern required him to work more than forty hours per week, yet he received no overtime pay as required by state law. In particular, starting in February 2023, Plaintiff spent his weekends fulfilling new job responsibilities instead of earning income through other means (e.g. through scheduling baseball camps).

84.     Plaintiff is due proper compensation for his regular and overtime hours as an employee at Northwestern.

85.     WHEREFORE, Plaintiff prays that this Court enter judgment on Count I of the Complaint in his favor against Defendant Northwestern in an amount to be determined at trial in excess of $50,000, and grant such other relief as this Court deems just and proper.

**Count II – Fair Labor Standards Act**
**(Northwestern)**

86.     The Plaintiff incorporates and realleges the allegations of paragraphs 1 through 85 as if fully set forth herein.

87.     The Plaintiff was an employee at Northwestern despite being erroneously labelled as a "volunteer".

FILED DATE: 2/21/2024 7:39 PM    2024L002016

88.     After Beacom, Napoleon, and Strauss became remote workers, Plaintiff, as demanded by Foster and authorized by Northwestern, assumed their job responsibilities of operations manager, pitching coach, and recruiter.

89.     Northwestern maintained control over the Plaintiff's assignments and work as evident through Foster's directives to the Plaintiff and the University's power to change the Plaintiff's workload, position, and compensation. For example, Northwestern refused to raise his compensation by $3,500 in April 2023, from $5,000 to $8,500.

90.     Plaintiff had little opportunity for profits besides the work that he was doing for Northwestern.

91.     For example, the Plaintiff could not even work baseball camps on weekends for money because he was so inundated with work from his three unpaid positions with Northwestern. The Plaintiff was supplied all equipment and computer programs by Northwestern in order to perform his many job responsibilities.

92.     Given Foster's assurances that the Plaintiff would have a countable coach position in the 2023–24 season, Plaintiff expected to stay with the Northwestern program for the foreseeable future.  Foster even enticed Plaintiff by telling him that he could get paid $100,000 as a pitching coach the following season.

93.     There was a strong degree of permanency to Plaintiff's employment with Northwestern, especially given Foster's assurances to the Plaintiff that Plaintiff could continue to coach with him.

94.     By the Plaintiff agreeing to step into additional roles on the baseball team, Northwestern had the ability to complete the 2022–23 baseball season despite losing *three* paid staff members at the start of the season. Consequently, Northwestern Baseball was and continues

FILED DATE: 2/21/2024 7:39 PM    2024L002016

to be an integral member of the prestigious Big10 Conference despite Foster's misconduct threatening to "run the baseball program into the ground."

WHEREFORE, Plaintiff prays that this Court enter judgment on Count II of the Complaint in his favor against Defendant Northwestern in an amount to be determined at trial in excess of $50,000, and grant such other relief as this Court deems just and proper.

### Count III – Illinois Wage Payment and Collection Act (Northwestern)

95.     The Plaintiff incorporates and realleges the allegations of paragraphs 1 through 94 as if fully set forth herein.

96.     The Plaintiff undeniably had an employment agreement with Northwestern. In particular:

> a.  Northwestern *explicitly* assented to the Plaintiff's paid employment when Velez continuously told the Plaintiff that she was inquiring about his wages.
>
> b.  Northwestern *explicitly* assented to the Plaintiff's paid employment when it paid him $5,000 on two occasions.
>
> c.  Northwestern *implicitly* assented to the Plaintiff's paid employment when it required him to perform the duties and job functions of multiple, historically paid positions.

97.     Therefore, Northwestern was required to pay the Plaintiff for his services within 13 days after the end of the pay period in which his wages were earned.

98.     To date, it is well beyond the end of *multiple* pay periods and the Plaintiff has not been compensated anywhere close to the value of his services.

99. WHEREFORE, the Plaintiff prays that this Court enter judgment on Count III of the Complaint in his favor against Defendant Northwestern in an amount to be determined at trial in excess of $50,000, and grant such other relief as this Court deems just and proper.

<u>**Count IV – Negligent Hiring**</u>
<u>**(Northwestern)**</u>

100. The Plaintiff incorporates and realleges the allegations of paragraphs 1 through 99 as if fully set forth herein.

101. Northwestern had a duty to properly vet Foster prior to hiring him as Head Baseball Coach.

102. Northwestern knew or should have known that Foster was unfit for the job of Head Baseball Coach at Northwestern creating a danger of harm to the Plaintiff, baseball staff, student-athletes, and the University as a whole.[8]

103. In particular, Northwestern, should have diligently vetted Foster prior to hiring him as Head Baseball Coach.[9]

104. Prior to his position at Northwestern, Foster faced allegations of abuse and bullying at Army West Point. In fact, there was even a "celebratory Zoom" when Foster left Army in summer 2022, and Army was in fact, "thrilled" to remove him.[10]

---

[8] Gragg allegedly conducted a "chaotic and unusual hiring process" and pawned off the hire of Foster to two Northwestern boosters. *See* https://www.insidenu.com/2023/7/10/23790160/jim-foster-accused-of-toxic-workplace-environment-nine-players-and-staffers-tell-670-the-score.

[9] Indeed, Northwestern has seemingly demonstrated an ongoing pattern of negligence, which continues to this day, in vetting its coaches. The problems arising out of the management of Northwestern's football program by the administration under Coach Pat Fitzgerald are well documented. Upon firing Mr. Fitzgerald, Northwestern hired David Braun as interim Head Football Coach on July 14, 2023, providing a news release that Coach Braun had previously obtained a master's degree in sports management and educational leadership. This was an utter fabrication, and just another example of Northwestern failing to conduct its due diligence on an important athletic hire. *See* https://www.chicagotribune.com/sports/college/ct-david-braun-northwestern-university-football-20230721-6uiijbjmzfa37fgs5b3xo3kypi-story.html.

[10] https://www.insidenu.com/2023/7/10/23790160/jim-foster-accused-of-toxic-workplace-environment-nine-players-and-staffers-tell-670-the-score

FILED DATE: 2/21/2024 7:39 PM    2024L002016

105. This information was readily available to Northwestern—information that it either recklessly disregarded or failed to diligently obtain in its vetting process, resulting in a breach of their duty to Plaintiff.

106. Even Foster himself has historically admitted to player abuse. For example, he openly "bragged" about students playing injured or sick on his watch.

107. In 2018, Foster referenced a pitcher's performance while injured—boasting about leaving him in for a pitch count that is recognized in the industry as alarmingly high even for healthy players, stating: "He was sick – pink eye, flu, or cold, something like that . . . He wasn't feeling good but he went out there and competed and threw 80 some pitches (actually 92 pitches, 58 of them strikes)."[11]

108. Foster was also the head baseball coach at the University of Rhode Island when a baseball player died after a team workout—ultimately resulting in a settlement between the family and the University.[12] This settlement was publicized through numerous media outlets and made national news years before Northwestern's hiring of Foster. The death purportedly occurred as a result of Foster's severe mismanagement and callous disregard for the health of his student-athletes.[13]

109. It should have come as no surprise that Foster continued this behavior at Northwestern. Yet when the Plaintiff, among other coaches and staff, corroborated concerns of player abuse and disregard for injuries, Northwestern did not speak to a single player to substantiate their allegations.

---

[11] https://www.kitsapsun.com/story/sports/columnists/terry-mosher/2018/06/26/terry-mosher-north-masons-burggraaf-pitched-tournament-army/732548002/.
[12] https://www.boston.com/news/local-news/2016/01/29/university-of-rhode-island-settles-lawsuit-in-baseball-players-2011-death/.
[13] https://www.insidenu.com/2023/7/10/23790160/jim-foster-accused-of-toxic-workplace-environment-nine-players-and-staffers-tell-670-the-score.

FILED DATE: 2/21/2024 7:39 PM 2024L002016

FILED DATE: 2/21/2024 7:39 PM    2024L002016

110.     As a result, a pitcher was needlessly injured during the season and was forced to undergo surgery. This is just one example of Northwestern's negligence in both hiring Foster and retaining him after a multitude of allegations to the NCAA and the University—allegations that Northwestern was ultimately [albeit belatedly] able to substantiate via its own internal investigation.

111.     Still, Northwestern negligently retained Foster as Head Baseball Coach for the entirety of the 2022-23 season, to the detriment of not only the Plaintiff, but also the baseball staff, student-athletes and the University as a whole.

112.     Northwestern granted Foster the authority as Head Baseball Coach to manage the baseball team and staff—including the authority to make decisions on staff retention and set policy. As a result, Foster acted as an alter ego of Northwestern, and in particular, its baseball program.

113.     For example, on March 3, 2023, during a game in Louisiana, Foster stripped Plaintiff of all pitching coach responsibilities because the team was losing.

114.     Foster—unlike any other staff members—also had the authority to add responsibilities to Plaintiff's growing list of concurrent positions.

115.     For example, Foster pressured Plaintiff to handle recruiting, operations, and pitching coach responsibilities after Beacom, Napoleon, and Strauss were stripped of their titles.

116.     Unfortunately, Foster's conduct was not surprising to Plaintiff given his history and reputation in the field, as well as the multitude of concerns and complaints raised by staff at Northwestern.

117.     As a direct and proximate result of Northwestern's hiring and retention of Foster, the Plaintiff suffered and will continue to suffer damages, including but not limited to losing

FILED DATE: 2/21/2024 7:39 PM    2024L002016

potential income and job opportunities and harming his reputation within the field and among colleagues.

118.    Plaintiff has also suffered and will continue to suffer emotional injuries stemming from Foster's misconduct and harassment that occurred throughout the 2022-23 baseball season.

119.    WHEREFORE, the Plaintiff prays that this Court enter judgment on Count IV of the Complaint in his favor against Defendant Northwestern in an amount to be determined at trial in excess of $50,000, and grant such other relief as this Court deems just and proper.

## COUNT V – Negligent Supervision
### (Northwestern, Holland, Velez)

120.    The Plaintiff incorporates and realleges the allegations of paragraphs 1 through 119 as if fully set forth herein.

121.    As Head Coach of the baseball team, Foster was in a position of authority over baseball staff members and had complete control over the policies and procedures of the team. As a result, Foster acted as an alter ego of Northwestern, and in particular, its baseball program.

122.    Northwestern, Holland, and Velez each had a duty to supervise Foster.

123.    These Defendants each breached their duty of care when they failed to adequately train Foster and educate him on the negative impact of abusive and bullying behavior, did not take any action to both sufficiently and substantially investigate Foster, and to terminate Foster for his tortious conduct, despite Plaintiff's complaints, Beacom, Napoleon, and Strauss's formal HR complaint, and their continuous pleas to HR to take action.

124.    Defendants' breaches of supervision were negligent in one or more of the following ways:

a.    Defendants knew, and were told on multiple occasions, that Foster created an abusive and toxic workplace environment.

FILED DATE: 2/21/2024 7:39 PM    2024L002016

    b.   Defendants knew or should have known that their failure to properly train and supervise Foster regarding policies against bullying would pose a high probability of serious harm to staff and student athletes, including Plaintiff.

    c.   Were otherwise negligent in their conscious disregard for the safety of their staff and student athletes, including but not limited to the Plaintiff.

125.    Northwestern knew of, and allowed this misconduct, knowing that it would continue to irreparably harm the Plaintiff.

126.    As a result, the Plaintiff's career as a Division I baseball coach has been stalled and his reputation has been permanently damaged.

127.    In fact, the Plaintiff was forced to take a step backward—by returning to the same exact Division III position and title he held prior to Northwestern—despite applying to other D I programs.

128.    Unfortunately, Foster's conduct was not surprising to Plaintiff given his history and reputation in the field, as well as the multitude of concerns and complaints raised by staff at Northwestern.

129.    As a direct and proximate result of these negligent acts and/or omissions, the Plaintiff suffered and continued to suffer damages, including but not limited to losing his dream job representing his hometown school near his family.

130.    Plaintiff has also suffered and will continue to suffer emotional injuries stemming from Foster's misconduct and harassment that occurred throughout the 2022-23 baseball season.

WHEREFORE, the Plaintiff prays that this Court enter judgment on Count V of the Complaint in his favor against Northwestern, Holland, and Velez in an amount to be determined

FILED DATE: 2/21/2024 7:39 PM    2024L002016

at trial in excess of $50,000, plus punitive damages, and grant such other relief as this Court deems just and proper.

## Count VI – Negligent Infliction of Emotional Distress
### (Northwestern, Holland, Velez)

131.    The Plaintiff incorporates and realleges the allegations of paragraphs 1 through 130 as if fully set forth herein.

132.    Defendants each owed the Plaintiff a duty of care to provide a safe, non-toxic work environment.

133.    Northwestern, Holland, and Velez breached their duty of care when they did not take any action to both sufficiently and substantially investigate Foster, and to terminate Foster for his tortious conduct, despite an HR complaint and the Plaintiff's continuous pleas to HR to take action.

134.    Foster breached his duty of care when he engaged in highly offensive conduct that he knew or should have known would harm the Plaintiff, including not limited to:

    a.  Yelling demeaning and slanderous comments at the Plaintiff in front of student athletes and staff.

    b.  Encouraging and pressuring the Plaintiff to violate NCAA rules and Northwestern policy, communicating with the Plaintiff using sexist, racist, and insensitive commentary and remarks.

135.    Defendants knew of, and allowed this misconduct, knowing that it would continue to irreparably harm the Plaintiff.

136.    The Plaintiff suffered severe emotional distress that resulted in him requesting mental health resources from the university. He did not receive any support—let alone a response to his request for support

FILED DATE: 2/21/2024 7:39 PM    2024L002016

137.    Unfortunately, Foster's conduct was not surprising to Plaintiff given his history and reputation in the field, as well as the multitude of concerns and complaints raised by staff at Northwestern.

138.    As a direct and proximate result of Defendants' breaches, the Plaintiff suffered extreme emotional distress.

WHEREFORE, Plaintiff prays that this Court enter judgment on Count VI of the Complaint in their favor against Defendants in an amount to be determined at trial in excess of $50,000, and grant such other relief as this Court deems just and proper.

### Count VII – Negligence (Willful and Wanton)
### (All Defendants)

139.    The Plaintiff incorporates and realleges the allegations of paragraphs 1 through 138 as if fully set forth herein.

140.    Defendants owed the Plaintiff a duty of care to provide a safe, non-toxic work environment.

141.    Northwestern, Holland, and Velez each breached their duty of care when they did not take any action to both sufficiently and substantially investigate Foster, and to terminate Foster for his tortious conduct, despite Beacom, Napoleon, and Strauss's HR complaint and the Plaintiff's continuous pleas to Northwestern to take action.

142.    Foster breached his duty of care when, as Head Coach, he failed to ensure and protect the safety and well-being of his staff and student athletes, including enforcing

28

Northwestern policies that prohibit inappropriate conduct such as rude, obnoxious, bullying behavior.[14] Defendants' breaches were willful and wanton in one or more of the following ways:

    a.  Northwestern, Holland, and Velez knew, and were told on multiple occasions, that Foster created an abusive and toxic workplace environment.

    b.  Northwestern, Holland, and Velez knew or should have known that their failure to properly train and supervise Foster regarding policies against bullying would pose a high probability of serious harm to staff and student athletes, including the Plaintiff.

    c.  Foster knew or should have known that abusing, cursing, and yelling at staff members would pose a high probability of serious harm to those staff members, including but not limited to the Plaintiff. Foster knew or should have known that exposing staff and student athletes to sexist, racist, and insensitive language and commentary would pose a high probability of serious harm to those staff members and student athletes, including but not limited to the Plaintiff.

    d.  Were otherwise willful and wanton in their conscious disregard for the safety of their staff and student athletes, including but not limited to the Plaintiff.

143.    Unfortunately, Foster's conduct was not surprising to Plaintiff given his history and reputation in the field, as well as the multitude of concerns and complaints raised by staff at Northwestern.

---

[14] In fact, the Northwestern Staff Handbook describes unacceptable behavior in the workplace: "Demeaning, intimidating, bullying, or violent behaviors that affect the ability to learn, work, live in the Northwestern environment depart from the standard for civility and respect. These behaviors have no place in the academic community." https://hr.northwestern.edu/documents/nu_staff_handbook.pdf.

FILED DATE: 2/21/2024 7:39 PM   2024L002016

FILED DATE: 2/21/2024 7:39 PM   2024L002016

144.     As a direct and proximate result of these willful and wanton acts and/or omissions, the Plaintiff suffered and continued to suffer damages, including but not limited to losing his dream job in his hometown near his family.

145.     Plaintiff has also suffered and will continue to suffer emotional injuries stemming from Foster's misconduct and harassment that occurred throughout the 2022-23 baseball season.

WHEREFORE, the Plaintiff prays that this Court enter judgment on Count IV of the Complaint in their favor against Defendants in an amount to be determined at trial in excess of $50,000, plus punitive damages, and grant such other relief as this Court deems just and proper.

### Count VIII – Intentional Infliction of Emotional Distress
### (Foster)

146.     The Plaintiff incorporates and realleges the allegations of paragraphs 1 through 145 as if fully set forth herein.

147.     As Head Baseball Coach, with complete control over and responsibility for the baseball program, Foster was the alter ego of Northwestern.

148.     Foster's conduct was extreme and outrageous by yelling and cursing at staff, repeatedly requesting staff to violate NCAA rules and regulations, pushing players beyond their physical limits without proper and sufficient medical attention, and emotionally manipulating staff while speaking derogatorily about them behind their backs.

149.     Foster knew or should have known that there was a high probability his extreme and outrageous conduct would cause severe emotional distress when staff and coaches were forced to: (1) endure his abusive and tortious conduct, (2) protect both one another and the student-athletes from his conduct, (3) report his conduct to HR, and (4) await the results of a lengthy and drawn-out HR investigation into his conduct.

FILED DATE: 2/21/2024 7:39 PM   2024L002016

150.     As a direct and proximate result of Foster's extreme and outrageous conduct, the Plaintiff suffered and continues to suffer severe emotional distress. In particular, the Plaintiff felt such extreme anxiety and distress from working with Foster that he requested help from Velez in getting a therapist for his declining mental health. Northwestern and Velez failed to provide the Plaintiff with any support and/or resources.

151.     Unfortunately, Foster's conduct was not surprising to Plaintiff given his history and reputation in the field, as well as the multitude of concerns and complaints raised by staff at Northwestern.

152.     Now, the Plaintiff is concerned about his reputation in the field and about the long-term impact on his mental health. In particular, the Plaintiff is currently unable to take full advantage of opportunities out of fear of a similar hostile and toxic work environment.

WHEREFORE, the Plaintiff prays that this Court enter judgment on Count VI of the Complaint in their favor against Foster in an amount to be determined at trial in excess of $50,000, and grant such other relief as this Court deems just and proper.

### Count VII – *Respondeat Superior* (Alternative)
### (Northwestern)

153.     The Plaintiff incorporates and realleges the allegations of paragraphs 1 through 152 as if fully set forth herein, and pleads the instant claim in the alternative.

154.     Foster was an employee of Northwestern during the 2022-2023 baseball season.

155.     Northwestern had the authority to control and prevent Foster's conduct, including terminating his contract for cause.

156.     Foster's negligent, willful, and malicious acts toward his staff and players occurred within the scope of his employment as Head Baseball Coach, including abusive yelling and cursing at staff, requesting staff to violate NCAA rules and regulations, excluding staff from meetings, and

31

FILED DATE: 2/21/2024 7:39 PM    2024L002016

discouraging players from seeking medical attention for injuries or potential injuries instead of attempting to prevent injuries.

157.    To the extent that Foster injured the Plaintiff through the negligent performance of his duties as Head Baseball Coach, Northwestern is liable through the doctrine of *respondeat superior*.

WHEREFORE, the Plaintiff prays that this Court enter judgment on Count VIII of the Complaint in their favor against Defendant Northwestern in an amount to be determined at trial in excess of $50,000, and grant such other relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands trial by jury on all matters alleged herein so triable.

Dated: February 21, 2024

Respectfully submitted,

  /s/    Christopher Esbrook

Christopher J. Esbrook (ARDC No. 6282829)
David F. Pustilnik (ARDC No. 6300609)
Heather A. Bartels (ARDC No. 6335536)
Esbrook P.C.
321 N. Clark Street Suite 1930
Chicago, Illinois 60654
(312) 319-7680
christopher.esbrook@esbrook.com
david.pustilnik@esbrook.com
heather.bartels@esbrook.com

*Attorneys for Plaintiff*