# EXHIBIT C

FILED
8/14/2023 8:59 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2023L008072
Calendar, T
23940144

FILED DATE: 8/14/2023 8:59 AM  2023L008072

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

CHRISTOPHER M. BEACOM, MICHAEL )
DUSTIN NAPOLEON, AND JONATHAN R. )
STRAUSS, )
       )    Case No.
      Plaintiffs, )
       )
    v. )
       )
NORTHWESTERN UNIVERSITY, DERRICK )   JURY TRIAL DEMANDED
GRAGG, JAMES THOMAS FOSTER, )
MONIQUE HOLLAND, AND RACHEL )
VELEZ, )
       )
      Defendants. )

## COMPLAINT

Plaintiffs Christopher M. Beacom ("Beacom"), Michael Dustin Napoleon ("Napoleon"), and Jonathan R. Strauss ("Strauss") (collectively "Plaintiffs"), by and through their undersigned counsel, Esbrook P.C., for their complaint against Defendants Northwestern University ("Northwestern"), Derrick Gragg ("Gragg"), James Thomas Foster ("Foster"), Monique Holland ("Holland"), and Rachel Velez ("Velez") (collectively "Individual Defendants", and together with Northwestern, "Defendants") state as follows:

## NATURE OF THE ACTION

1. This action arises out of Northwestern and the individual Defendants' collective failure to address the sustained environment of toxicity, abuse, and harassment that the Plaintiffs suffered throughout the 2022–2023 baseball season at Northwestern—particularly at the hands of Northwestern's former Head Baseball Coach, Jim Foster.

2. Northwestern and Dr. Gragg's negligent hiring of Foster, as well as the Defendants' continued failures to stop the mistreatment of its employees and students by Foster, are well-

FILED DATE: 8/14/2023 8:59 AM   2023L008072

documented. Despite the Plaintiffs repeatedly telling the Defendants, including numerous staff members within its Athletic and Human Resources ("HR") departments, about the abusive, toxic, and dangerous environment created by Foster, the Defendants continued to protect Foster rather than its staff and student-athletes.

3.　　As a result of the negligent hiring of Foster and the outrageous mishandling of the investigation into Foster's misconduct after he was hired, not only were the Plaintiffs prevented from doing their jobs, but they also suffered severe and extensive emotional distress arising from both Foster's ongoing toxic behavior, as well as from being stigmatized because of their association with Foster's toxic program.

4.　　Northwestern not only breached its contractual obligations to the Plaintiffs, but, together with the Individual Defendants where indicated, is further liable to the Plaintiffs for the negligent hiring and supervision of Foster, negligent and intentional infliction of emotional distress on Plaintiffs, and the fraudulent inducement of Plaintiffs to enter into employment contracts with Northwestern. Additionally, given Foster's own illegal and tortious conduct, Northwestern is also liable for the acts of Foster, its former employee, through the doctrine of *respondeat superior*.

## PARTIES

5.　　Beacom is an individual residing in Cook County, Illinois. He is the former Director of Baseball Operations at Northwestern.[1]

6.　　Napoleon is an individual residing in Cook County, Illinois. He is a former Assistant Baseball Coach at Northwestern.[2]

---

[1] See https://nusports.com/sports/baseball/roster/coaches/chris-beacom/2985.　Despite his termination, Beacom's biography remains published on Northwestern's website.

[2] See https://nusports.com/sports/baseball/roster/coaches/dusty-napoleon/2984.　Despite his termination, Napoleon's biography remains published on Northwestern's website.

2

7.  Strauss is an individual residing in McLennan County, Texas. He is a former Assistant Baseball Coach at Northwestern.

8.  Northwestern is a comprehensive research university with its principal place of business located at 633 Clark Street, Evanston, IL 60208.

9.  Gragg is an Illinois resident. He is currently the Combe Family Vice President for Athletics and Recreation at Northwestern.

10.  On information and belief, Foster is an Illinois resident. He is the former Head Baseball Coach at Northwestern.

11.  Holland is an Illinois resident. She is currently Deputy Director of Athletics (Chief of Staff) at Northwestern.

12.  Velez is an Illinois resident. She is currently Associate A.D. for Human Resources at Northwestern.

## JURISDICTION AND VENUE

13.  Jurisdiction is proper in this Court under 735 ILCS 5/2-209 because Northwestern's principal place of business is in Cook County, Illinois, and because the Defendants transact business within Illinois, have committed tortious conduct in Illinois, make and perform contracts substantially connected to Illinois, and maintain continuous and systematic contacts in Illinois.

14.  Venue is proper in Cook County, Illinois, under 735 ILCS 5/2-101 because Northwestern's principal place of business is in Cook County, Illinois and the facts and circumstances giving rise to the claims asserted herein occurred substantially in Cook County, Illinois.

## FACTS

15.  In June 2022, Northwestern hired Foster as Head Baseball Coach.

FILED DATE: 8/14/2023 8:59 AM   2023L008072

16.     Northwestern invited Foster to leave Army West Point after six years—with an established and well-known reputation as a bully—to join Northwestern.

17.     Northwestern hired Foster despite his departure from Army West Point for allegations of abuse and misconduct made against him by student-athletes at Army West Point, allegations that were apparent upon a proper investigation and vetting of Foster prior to his being hired by Northwestern.

18.     From the very beginning of Foster's tenure at Northwestern, the Plaintiffs were subjected to abuse and bullying by Foster while Northwestern continued to protect Foster—above the baseball staff, its student-athletes, and even its recruits.

19.     Specifically:

a.  Foster exhibited volatile, unpredictable behavior with frequent blow-ups.

b.  Foster approached a student-athlete during a high school weekend camp to give advice on how to pitch and referred to a batter he faced as the "Chinese kid."

c.  Foster stated that he did not want the female team manager on the field because he did not want "the guys staring at her ass."

d.  Foster created such a toxic environment that staff members felt too uncomfortable to go the lunchroom because they would have to interact with Foster—causing them severe anxiety and stress.

e.  Foster frequently yelled at staff members in profanity-laced tirades telling them, for example, to "just fucking answer [his] question."

f.  On November 17, 2022, at a staff meeting in the Mogentale Players' Lounge, Foster yelled at a staff member that he "could fucking leave right now if [he didn't] like

4

FILED DATE: 8/14/2023 8:59 AM   2023L008072

it" and when Napoleon tried to help deescalate the situation, he was told by Foster that "I don't need a fucking referee."

    g.    Foster repeatedly asked staff members to violate NCAA rules, including meeting with underage players and conducting unofficial visits.

    h.    Foster put student-athletes at risk by attempting to deny them appropriate medical care.

20.     In or around October 2022, the Plaintiffs began the process of formally reporting Foster's behavior to the Northwestern administration.

21.     Northwestern assigned each team a "sport administrator" (Mark Wesoloski) to act as a liaison between the Athletic Department and the University. Mr. Wesoloski's title is Associate Athletics Director for Ticket Operations ("AD").

22.     Rather than working as a liaison for the baseball team, Mr. Wesoloski only performed his normal daily function overseeing ticket sales, game-day ticket operations and service and was not available as a critical resource.

23.     Plaintiffs also did not report Foster to Holland, the Deputy Director of Athletics and Chief of Staff, because she played a part in hiring Foster, and she repeatedly defended Foster throughout the baseball season.

24.     Instead, Plaintiffs approached Janna Blais, the Deputy Director of Athletics (Administration & Policy)/SWA, and Maria Sanchez, the Senior Associate A.D./Chief Diversity & Inclusion Officer.

25.     Blais and Sanchez shared that they were horrified by the allegations against Foster and provided the men with the process for filing a complaint with HR.

26.     On November 30, 2022, the Plaintiffs submitted a complaint to HR that outlined:

FILED DATE: 8/14/2023 8:59 AM    2023L008072

    a.   The toxic work environment created by Foster that not only lacked professionalism but subjected the staff and players to abuse and bullying.

    b.   Foster discouraging players from seeking medical attention for injuries.

    c.   Foster's racially insensitive comments regarding recruits to the Northwestern baseball team.

    d.   Foster's derogatory and sexist comments regarding a female student manager.

27.    Plaintiffs also informed HR that they had separately reported Foster to the NCAA for various NCAA violations.

28.    After the filing of their HR complaint, and despite the serious nature of the allegations, Plaintiffs heard *nothing* from HR for months.

29.    In fact, HR did not communicate *at all* with Plaintiffs regarding their HR complaint until the middle of January 2023. All the while, Plaintiffs and student-athletes were left to suffer at the hands of Foster.

30.    Meanwhile, Foster had been aware of the HR complaint filed against him and was free to retaliate against the men as he saw fit, while happily maintaining the abusive and toxic workplace in which he thrived.

31.    Nevertheless, the Plaintiffs continued to work primarily to protect the student-athletes from the threat of Foster.

32.    In January 2023, HR finally interviewed each of the Plaintiffs separately. As Foster's toxicity escalated, the Plaintiffs waited for HR to conclude its investigation. When they reached out for support, they were either ignored or told to "trust" Northwestern's process.

FILED DATE: 8/14/2023 8:59 AM    2023L008072

33.     Rather than conduct a wide-ranging and thorough investigation in light of the serious nature of the allegations, HR only interviewed the Plaintiffs, the trainer, and a volunteer coach.

34.     Despite the fact that the Plaintiffs blew the whistle on Foster's disregard for the health and safety of players on the team, HR did not interview a single student-athlete or medical professional.

35.     During the HR investigation conducted by Velez and Tracy Marquette Gioia-Walker, the Plaintiffs continued to face toxicity and abuse from not only Foster, but from the very administrators who were supposed to protect them.

36.     Specifically:

a.     On January 18, 2023, Strauss emailed Velez asking whether they were required to work at Foster's privately-owned baseball camps given the HR complaint against Foster and the Plaintiffs' revelations of abuse at the hands of Foster. After receiving no response, Strauss followed-up on January 21. Velez responded that even though it is not a Northwestern requirement to work camp, she would encourage a "conversation with coach Foster in advance . . . we still care about [N]orthwestern baseball and do not want our programs name to suffer." Rather than address Strauss's concerns with being further exposed to further abuse at the hands of Foster, Velez was more focused on whether Northwestern's name might suffer if the Plaintiffs did not attend Foster's camp.

b.     On January 18, 2023, Napoleon emailed Velez that "Jim Foster continued his childish behavior of making disparaging remarks about myself, Chris Beacom, and

7

FILED DATE: 8/14/2023 8:59 AM   2023L008072

Jon Strauss behind our backs." His concerns were ignored by Northwestern and Velez, and he did not receive a response.

c.  On January 23, 2023, Beacom emailed Velez and Marquette Gioia-Walker to discuss how Foster's "lack of attendance at practices has now become an open joke among our players." Staff and players remarked how "strange it was that he was at both his camps [that] weekend but couldn't make it to practice." He did not receive a response.

d.  On January 25, 2023, Beacom emailed Velez and Marquette Gioia-Walker that his "current way of life [was] not sustainable" and was taking a significant toll on his mental health, and that for the "first time in four years," he went back on medication to support his mental health. He did not receive a response.

e.  On January 28, 2023, Beacom emailed Dr. Gragg and Holland to inform them that the baseball program was "rudderless and toxic due to Jim Foster's lack of leadership" and requested a meeting to share their experiences and concerns. He did not receive a response.

f.  On February 2, 2023, Strauss emailed Dr. Gragg with a subject line of "URGENT – MEETING REQUEST – BASEBALL" to discuss the escalating "dysfunctional situation" and how their "<u>cries for help have not been answered.</u>" He did not receive a response.

g.  On February 1, 2023, Holland met separately with Foster and the Plaintiffs. She told the men they were "just facing a little adversity." After she had a private meeting with Foster, Beacom requested a similar private meeting and Holland refused—minimizing Foster's behavior and implicitly endorsing it on behalf of

FILED DATE: 8/14/2023 8:59 AM    2023L008072

Northwestern. When Strauss asked who was going to protect them, Holland remarked that she had to remain impartial. She did not say who would protect them—***because the answer was no one***.

    h.    Holland continued to meet one-on-one with Foster during this time. Dr. Gragg refused to speak with the Plaintiffs.

37.    On February 15, 2023, before the baseball team was to travel for their first away game of the season in Texas, Velez sent an email to the Plaintiffs stating that "there is enough evidence to substantiate several of the claims" and that they "will receive a formal letter addressing the investigation" but they wanted to provide an update since they were set to travel the next day. Holland would be travelling with the team as a resource.

38.    Holland left after the first game, allowing for "all hell to break loose" at the second game of the trip. In particular, Foster publicly yelled at Strauss the entire game and first undermined, and then ultimately revoked, his authority with regard to any of the pitchers despite his role as pitching coach.

39.    On February 23, 2023, approximately three months after the initial complaint with HR was filed, Northwestern provided a letter to each of the Plaintiffs, dated February 22, 2023, stating as follows:

> Coach Foster's conduct violated University policy. Specifically, we found sufficient evidence to substantiate your allegations that Coach Foster engaged in bullying and abusive behavior, made an inappropriate comment regarding a female staff member, and spoke negatively about his staff to other staff members.

*See* letters dated February 22, 2023 attached hereto as **Exhibit A** and made a part hereof.

40.    That same day, Dr. Gragg confirmed that none of the three men would be returning, and that Northwestern was in the process of hiring new coaches.

FILED DATE: 8/14/2023 8:59 AM   2023L008072

41.     Shockingly, Northwestern retaliated against the Plaintiffs for coming forward with their horrific but truthful allegations against Foster by banishing them from the baseball program.

42.     In fact, Holland often callously remarked that "sometimes the right thing to do isn't the best thing,"[3] despite the fact that in the body of the very email provided to the Plaintiffs on February 23, 2023 attaching the letter summarizing the conclusions of Northwestern's investigation, Velez thanked the Plaintiffs for coming forward with their concerns, stating:

> It is our sincere hope that as this investigation has closed, we can find a way to move forward and work together for our student-athletes. We appreciate you coming forward with your concerns and will always encourage you to do so through the proper channels.

43.     Her email went on to discuss a mediation for the baseball staff to establish cohesion and unity for the baseball program—despite none of the Plaintiffs getting to move forward as a part of the baseball program.

44.     In fact, all three men were forced by Northwestern to become remote special contract workers to receive pay for the remainder of their contracts, but they ultimately lost their positions on the baseball team at Northwestern in June 2023 in a retaliatory move, yet Foster remained as Head Baseball Coach.

45.     Meanwhile, despite Northwestern having confirmed the allegations of Foster's bullying, derogatory comments, and toxicity in the workplace, it opted to support Foster as Head Baseball Coach for the entirety of the 2022–23 baseball season thereby endorsing his outrageous conduct.

46.     Northwestern finally decided to terminate Foster on July 13, 2023, three days after the highly-publicized firing of head football coach Patrick Fitzgerald with ensuing scrutinizing

---

[3]  https://www.insidenu.com/2023/7/10/23790160/jim-foster-accused-of-toxic-workplace-environment-nine-players-and-staffers-tell-670-the-score.

FILED DATE: 8/14/2023 8:59 AM    2023L008072

press coverage. Unfortunately, this was far too little, far too late. In the press release terminating Foster, Dr. Gragg stated as follows:

    a.   "Nothing will ever be more important to Northwestern than providing its students a place that allows them to develop in the classroom, in the community, and in competition at the absolute highest level, and building a culture which allows our staff to thrive. This has been an ongoing situation and many factors were considered before reaching this resolution. As the Director of Athletics, I take ownership of our head coaching hires and we will share our next steps as they unfold."[4]

47.    Northwestern had every opportunity to do the right thing and actually "provide[] its students a place that allows them to develop in the classroom, in the community, and in competition at the highest level, and building a culture which allows [its] staff to thrive." It was warned about Foster repeatedly—both formally and informally—both before and after his hire.

48.    Northwestern was informed, on numerous occasions, and even via a formal HR complaint, of the incredibly detrimental impact Foster's presence was having on Northwestern's program and culture.

49.    Still, Northwestern did ***nothing***.

50.    Dr. Gragg and the University were only forced to take action when these issues came to public light via multiple media outlets and litigation involving the Athletic Department.[5]

51.    As indicated by the twelve complaints—and counting—filed in Cook County, Illinois since the beginning of July 2023 in connection with Northwestern's football and volleyball

---

[4]  https://www.espn.com/college-sports/story/_/id/38007877/northwestern-fires-baseball-coach-jim-foster-sources-say.

[5] Unsurprisingly, recent filings in Cook County against Northwestern allege that Foster engaged in "bullying and abusive behavior towards students at Northwestern." *See, e.g.*, *John Doe 1 v. Northwestern University et al.*, Case No. 2023L007098, ¶ 35.

FILED DATE: 8/14/2023 8:59 AM    2023L008072

programs, Northwestern has repeatedly demonstrated its failure to properly handle and resolve inappropriate and *harmful* conduct within its athletic community.[6]

52.     Northwestern has itself since recognized that the culture of its athletic department is severely damaged. On August 2, 2023, Northwestern took the drastic step of hiring former U.S. Attorney General Loretta Lynch to lead an investigation into the culture of its athletic department "following allegations of abusive behavior and racism within the football program and other teams."[7]

53.     Unfortunately, Ms. Lynch cannot undo the damage that has already been done.

54.     Simply put, Northwestern not only breached its contractual obligations to Plaintiffs, but is liable for the negligent hiring and supervision of Foster, intentional infliction of emotional distress, negligent infliction of emotional distress, and fraudulent inducement to enter into employment contracts with Northwestern as well as the retaliatory discharge of Plaintiffs for reporting abusive conduct by Foster in reliance on Northwestern's policies that encourage staff do so as stated in its Staff Handbook.

## Count I – Breach of Contract
## (Northwestern)

55.     Plaintiffs incorporate and reallege the allegations of paragraphs 1 through 54 as if fully set forth herein.

56.     Northwestern entered into valid and enforceable employment contracts with the Plaintiffs.

---

[6] *See* Circuit Court of Cook County, Illinois Case Nos. 2023L007098; 2023L007221; 2023L007226; 2023L007300; 2023L007396; 2023L007485; 2023L007499; 2023L007705; 2023L007707; 2023L007711; 2023L007712; 2023L007713.
[7] https://apnews.com/article/loretta-lynch-northwestern-hazing-f8f19d4066e88bc7bf5705b42dae6e40.

FILED DATE: 8/14/2023 8:59 AM 2023L008072

57.     The Plaintiffs each performed their obligations under their respective employment contracts.

58.     Northwestern's Staff Handbook[8] was explicitly incorporated into the employment contracts of the Plaintiffs.

59.     Northwestern breached its obligations under the Staff Handbook when it continuously disregarded reports of retaliation; abuse; a toxic and hostile work environment; NCAA violations; physical and mental health concerns for both players and staff; and racially insensitive and sexist comments.

60.     In particular, Northwestern breached its "Non-retaliation" policy, which states:

   a.   "Northwestern strictly prohibits retaliation against ***any member of its community*** for reporting or inquiring in good faith about what the member believes to be wrongful or unlawful activity, or for participating in an investigation or proceeding related to such activity. ***Northwestern considers such reporting, inquiring, or participating to be protected activities in which all members of the University may freely engage***."

   b.   "Northwestern encourages members of its community to report all information regarding any activity they reasonably believe to be wrongful or unlawful . . . . Northwestern is firmly committed to a policy of encouraging ***timely disclosure*** of such concerns and prohibits retaliation against any member of the University who, in good faith, reports such concerns."

---

[8] 2023 Northwestern University Staff Handbook, https://hr northwestern.edu/documents/nu_staff_handbook.pdf.

FILED DATE: 8/14/2023 8:59 AM    2023L008072

c. "Retaliation is an action, performed directly or through others, that is aimed to deter a reasonable person from engaging in a protected activity or is done in retribution for engaging in a protected activity."

d. "Examples of materially adverse actions that could constitute retaliation include, but are not limited to: . . . Decisions relating to one's work assignments, vacation, or promotion or advancement opportunities (whether employment-related or academic) . . . [and] [e]ngaging in harassing conduct that is sufficiently severe, pervasive, and/or persistent to create a hostile environment . . . ."

e. "In addition, no community member may be retaliated against for refusing to carry out a directive ordering the member to engage in wrongful or unlawful activity."

61.     Despite this policy, Northwestern and Foster retaliated against Plaintiffs in direct violation of the policy for, in good faith, the Plaintiffs' timely reporting of wrongful activity in accordance with the policy.

62.     After learning of the HR complaint, Foster would "ice out" Plaintiffs, excluding them from team meetings and assigning their work to others, such as the student manager—despite Northwestern's policy specifically defining decisions related to work assignments as materially adverse and constituted retaliation.

63.     Beginning in February 2023, Plaintiffs were forced by the administration to become remote special contract workers to receive pay for the remainder of their contracts—again, despite Northwestern's own non-retaliation policy.

64.     Plaintiffs then lost their positions on the baseball team in June 2023—again, despite Northwestern's non-retaliation policy.

FILED DATE: 8/14/2023 8:59 AM    2023L008072

65.     As a direct and proximate result of Northwestern's breach, Plaintiffs suffered and will continue to suffer damages.

WHEREFORE, Plaintiffs Beacom, Napoleon, and Strauss pray that this Court enter judgment on Count I of the Complaint in their favor against Defendant Northwestern in an amount to be determined at trial in excess of $50,000, and grant such other relief as this Court deems just and proper.

### Count II – Negligent Hiring
### (Northwestern and Gragg)

66.     Plaintiffs incorporate and reallege the allegations of paragraphs 1 through 65 as if fully set forth herein.

67.     Northwestern and Gragg knew or should have known that Foster was unfit for the job of Head Baseball Coach at Northwestern so as to create a danger of harm to Plaintiffs, as well as to student-athletes and the University as a whole.[9]

68.     In particular, Northwestern and Gragg, as Athletic Director, should have diligently vetted Foster prior to hiring him as Head Baseball Coach.[10]

69.     Prior to his position at Northwestern, Foster faced allegations of abuse and bullying at Army West Point.

---

[9] Gragg allegedly conducted a "chaotic and unusual hiring process" and pawned off the hire of Foster to two Northwestern boosters. *See* https://www.insidenu.com/2023/7/10/23790160/jim-foster-accused-of-toxic-workplace-environment-nine-players-and-staffers-tell-670-the-score.

[10] Indeed, Northwestern has seemingly demonstrated an ongoing pattern of negligence, which continues to this day, in vetting its coaches. The problems arising out of the management of Northwestern's football program by the administration under Coach Pat Fitzgerald are well documented. Upon firing Mr. Fitzgerald, Northwestern hired David Braun as interim Head Football Coach on July 14, 2023, providing a news release that Coach Braun had previously obtained a master's degree in sports management and educational leadership. This was later reported to be an utter fabrication, and just another example of Northwestern failing to conduct its due diligence on an important athletic hire. *See* https://www.chicagotribune.com/sports/college/ct-david-braun-northwestern-university-football-20230721-6uiijbjmzfa37fgs5b3xo3kypi-story.html.

FILED DATE: 8/14/2023 8:59 AM    2023L008072

70.    In fact, there was even a "celebratory Zoom" when Foster left Army in summer 2022, and Army was in fact, "thrilled" to remove him.[11]

71.    This is information that was readily accessible to Northwestern—information that it either recklessly disregarded or failed to diligently obtain in its vetting process.

72.    Even Foster himself admitted to player abuse. For example, he openly "bragged" about students playing injured or sick on his watch.

73.    In 2018, he referenced a pitcher's performance while injured, and also boasted about leaving him in for a pitch count that is recognized as alarmingly high even for healthy players, stating:

   a.    "He was sick – pink eye, flu, or cold , something like that . . . He wasn't feeling good but he went out there and competed and threw 80 some pitches (actually 92 pitches, 58 of them strikes)."[12]

74.    Foster was also the head baseball coach at the University of Rhode Island when a baseball player died after a team workout—ultimately resulting in a settlement between the family and the University.[13] This settlement was publicized through numerous media outlets and made national news years before Northwestern's hiring of Foster. The death purportedly occurred as a result of Foster's severe mismanagement and callous disregard for the health of his student-athletes.

---

[11] https://www.insidenu.com/2023/7/10/23790160/jim-foster-accused-of-toxic-workplace-environment-nine-players-and-staffers-tell-670-the-score.

[12] https://www.kitsapsun.com/story/sports/columnists/terry-mosher/2018/06/26/terry-mosher-north-masons-burggraaf-pitched-tournament-army/732548002/.

[13] https://www.boston.com/news/local-news/2016/01/29/university-of-rhode-island-settles-lawsuit-in-baseball-players-2011-death/.

FILED DATE: 8/14/2023 8:59 AM   2023L008072

75.     It should have come as no surprise that Foster continued this behavior at Northwestern. Yet when the Plaintiffs raised concerns of player abuse and disregard for injuries, Northwestern did not speak to a single player to substantiate their allegations.

76.     As a result, a pitcher was needlessly injured this season and was forced to undergo surgery. This is just one example of Northwestern's negligence in both hiring Foster *and retaining him* after a multitude of allegations to the NCAA and the University—allegations that Northwestern was ultimately [albeit belatedly] able to substantiate via its own internal investigation.

77.     Still, Northwestern and Gragg negligently retained Foster as Head Baseball Coach for the entirety of the 2022-23 season, to the detriment of not only the Plaintiffs, but also the student-athletes and the University as a whole.

78.     As a direct and proximate result of Northwestern and Gragg's hiring and retention of Foster, Plaintiffs suffered and will continue to suffer damages.

WHEREFORE, Plaintiffs Beacom, Napoleon, and Strauss pray that this Court enter judgment on Count II of the Complaint in their favor against Defendant Northwestern and Gragg in an amount to be determined at trial in excess of $50,000, and grant such other relief as this Court deems just and proper.

### <u>Count III – Negligent Supervision (Willful and Wanton)</u><br><u>(Northwestern, Gragg, Holland, and Velez)</u>

79.     Plaintiffs incorporate and reallege the allegations of paragraphs 1 through 78 as if fully set forth herein.

80.     Northwestern, Gragg, Holland, and Velez each had a duty to supervise Foster.

81.     These Defendants each breached their duty of care when they failed to adequately train Foster and educate him on the negative impact of abusive and bullying behavior, did not take

FILED DATE: 8/14/2023 8:59 AM   2023L008072

any action to both sufficiently and substantially investigate Foster, and to terminate Foster for his tortious conduct, despite Plaintiffs' HR complaint and their continuous pleas to HR to take action.

82.   Defendants breaches were willful and wanton in one or more of the following ways:

a.   Defendants knew, and were told on multiple occasions, that Foster created an abusive and toxic workplace environment.

b.   Defendants knew or should have known that their failure to properly train and supervise Foster regarding policies against bullying would pose a high probability of serious harm to staff and student athletes, including Plaintiffs.

c.   Were otherwise willful and wanton in their conscious disregard for the safety of their staff and student athletes, including but not limited to Plaintiffs.

83.   As a direct and proximate result of these willful and wanton acts and/or omissions, suffered and continued to suffer damages, including but not limited to each losing their dream jobs and now being unable to find meaningful employment in their field of work in which they have been a part for many years.

WHEREFORE, Plaintiffs Beacom, Napoleon, and Strauss pray that this Court enter judgment on Count III of the Complaint in their favor against Northwestern, Gragg, Holland, and Velez in an amount to be determined at trial in excess of $50,000, plus punitive damages, and grant such other relief as this Court deems just and proper.

FILED DATE: 8/14/2023 8:59 AM   2023L008072

## **Count IV – Negligence (Willful and Wanton)**
## **(All Defendants)**

84. Plaintiffs incorporate and reallege the allegations of paragraphs 1 through 83 as if fully set forth herein.

85. Defendants owed Plaintiffs a duty of care to provide a safe, non-toxic work environment.

86. Northwestern, Gragg, Holland, and Velez each breached their duty of care when they did not take any action to both sufficiently and substantially investigate Foster, and to terminate Foster for his tortious conduct, despite Plaintiffs' HR complaint and their continuous pleas to HR to take action.

87. Foster breached his duty of care when, as Head Coach, he failed to ensure and protect the safety and well-being of his staff and student athletes, including enforcing Northwestern policies that prohibit inappropriate conduct such as rude, obnoxious, bullying behavior.[14] Defendants' breaches were willful and wanton in one or more of the following ways:

   a. Northwestern, Gragg, Holland, and Velez knew, and were told on multiple occasions, that Foster created an abusive and toxic workplace environment.

   b. Northwestern, Gragg, Holland, and Velez knew or should have known that their failure to properly train and supervise Foster regarding policies against bullying would pose a high probability of serious harm to staff and student athletes, including Plaintiffs.

---

[14] In fact, the Northwestern Staff Handbook describes unacceptable behavior in the workplace: "Demeaning, intimidating, bullying, or violent behaviors that affect the ability to learn, work, live in the Northwestern environment depart from the standard for civility and respect. These behaviors have no place in the academic community." https://hr.northwestern.edu/documents/nu_staff_handbook.pdf.

FILED DATE: 8/14/2023 8:59 AM    2023L008072

c.  Foster knew or should have known that abusing, cursing, and yelling at staff members would pose a high probability of serious harm to those staff members, including but not limited to Plaintiffs. Foster knew or should have known that exposing staff and student athletes to sexist, racist, and insensitive language and commentary would pose a high probability of serious harm to those staff members and student athletes, including but not limited to Plaintiffs.

d.  Were otherwise willful and wanton in their conscious disregard for the safety of their staff and student athletes, including but not limited to Plaintiffs.

88.    As a direct and proximate result of these willful and wanton acts and/or omissions, Plaintiffs suffered and continued to suffer damages, including but not limited to each losing their dream jobs and now being unable to find meaningful employment.

WHEREFORE, Plaintiffs Beacom, Napoleon, and Strauss pray that this Court enter judgment on Count IV of the Complaint in their favor against Defendants in an amount to be determined at trial in excess of $50,000, plus punitive damages, and grant such other relief as this Court deems just and proper.

### Count V – Negligent Infliction of Emotional Distress
### (All Defendants)

89.    Plaintiffs incorporate and reallege the allegations of paragraphs 1 through 88 as if fully set forth herein.

90.     Defendants each owed Plaintiffs a duty of care to provide a safe, non-toxic work environment.

91.    Northwestern, Gragg, Holland, and Velez breached their duty of care when they did not take any action to both sufficiently and substantially investigate Foster, and to terminate

FILED DATE: 8/14/2023 8:59 AM 2023L008072

Foster for his tortious conduct, despite Plaintiffs' HR complaint and their continuous pleas to HR to take action.

92.     Foster breached his duty of care when he engaged in highly offensive conduct that he knew or should have known would harm Plaintiffs, including not limited to:

a. Yelling demeaning and slanderous comments at Plaintiffs in front of student athletes and staff.

b. Bullying Plaintiffs to violate NCAA rules and Northwestern policy. Communicating with Plaintiffs using sexist, racist, and insensitive commentary and remarks.

93.      As a direct and proximate result of Defendants' breaches, Plaintiffs each suffered extreme emotional distress.

WHEREFORE, Plaintiffs Beacom, Napoleon, and Strauss pray that this Court enter judgment on Count V of the Complaint in their favor against Defendants in an amount to be determined at trial in excess of $50,000, and grant such other relief as this Court deems just and proper.

## Count VI – Intentional Infliction of Emotional Distress
### (Foster)

94.     Plaintiffs Beacom, Napoleon, and Strauss incorporate and reallege the allegations of paragraphs 1 through 93 as if fully set forth herein.

95.     Foster's conduct was extreme and outrageous by yelling and cursing at staff, repeatedly requesting staff to violate NCAA rules and regulations, pushing players beyond their physical limits without proper and sufficient medical attention, and emotionally manipulating staff while speaking derogatorily about them behind their backs.

FILED DATE: 8/14/2023 8:59 AM    2023L008072

96.     Foster knew or should have known that there was a high probability his extreme and outrageous conduct would cause severe emotional distress when staff and coaches were forced to: (1) endure his abusive and tortious conduct, (2) protect both one another and the student-athletes from his conduct, (3) report his conduct to HR, and (4) await the results of a lengthy and drawn-out HR investigation into his conduct.

97.     As a direct and proximate result of Foster's extreme and outrageous conduct, Plaintiffs each suffered and continue to suffer severe emotional distress. Specifically, Plaintiffs each felt such extreme anxiety and distress when interacting with Foster that they skipped meals and were compelled to use the baseball lounge and other areas to avoid contact with him. In particular, Beacom's mental health suffered so severely that he was forced to begin taking medication again during the 2022-23 baseball season after years of successfully managing his mental health without it.

98.     Now, Plaintiffs are each fearful to enter another workplace—if they are ever able to obtain a job in light of their association with Foster's program—because they might be subjected to a similarly toxic environment.

WHEREFORE, Plaintiffs Beacom, Napoleon, and Strauss pray that this Court enter judgment on Count VI of the Complaint in their favor against Foster in an amount to be determined at trial in excess of $50,000, and grant such other relief as this Court deems just and proper.

**Count VII – Fraudulent Inducement**
**(Northwestern)**

99.     Plaintiffs incorporate and reallege the allegations of paragraphs 1 through 98 as if fully set forth herein.

FILED DATE: 8/14/2023 8:59 AM    2023L008072

100.     When accepting their employment at Northwestern and entering into contracts with Northwestern, Plaintiffs were each ensured that they would work in a healthy, non-toxic, safe workplace where they could thrive personally and professionally.

101.     Northwestern knew or should have known of Foster's reputation as an abusive bully, yet still hired him, and in turn, consented to a toxic, unsafe workplace environment.

102.     Northwestern induced Plaintiffs to enter into contracts with the University by representing the University and its programs as safe and collaborative—painting the culture, workplace, and overall institution as healthy and enriching.

103.     Plaintiffs each relied upon these representations when they decided to forgo employment elsewhere for the 2022-2023 baseball season. In fact, Strauss left his job and sold his house in Texas for the opportunity to work at Northwestern.

104.     As a direct and proximate result of Northwestern's representations, Plaintiffs each suffered. In particular, Plaintiffs are unable to gain meaningful employment due to their association with Foster and Northwestern's Athletic department, and they each suffer from distress that manifested into physical and/or mental injury as well.

WHEREFORE, Plaintiffs Beacom, Napoleon, and Strauss pray that this Court enter judgment on Count VII of the Complaint in their favor against Defendant Northwestern in an amount to be determined at trial in excess of $50,000, and grant such other relief as this Court deems just and proper.

## Count VIII – *Respondeat Superior*
### (Northwestern)

105.     Plaintiffs incorporate and reallege the allegations of paragraphs 1 through 104 as if fully set forth herein.

106.     Foster was an employee of Northwestern during the 2022-2023 baseball season.

FILED DATE: 8/14/2023 8:59 AM   2023L008072

107.    Northwestern had the authority to control and prevent Foster's conduct, including terminating his contract for cause.

108.    Foster's negligent, willful, and malicious acts toward his staff and players occurred within the scope of his employment as Head Baseball Coach, including abusive yelling and cursing at staff, requesting staff to violate NCAA rules and regulations, excluding staff from meetings, and discouraging players from seeking medical attention for injuries or potential injuries instead of attempting to prevent injuries.

109.    To the extent that Foster injured Plaintiffs through the negligent performance of his duties as Head Baseball Coach, Northwestern is liable through the doctrine of *respondeat superior*.

WHEREFORE, Plaintiffs Beacom, Napoleon, and Strauss pray that this Court enter judgment on Count VIII of the Complaint in their favor against Defendant Northwestern in an amount to be determined at trial in excess of $50,000, and grant such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand trial by jury on all matters alleged herein so triable.

Dated: August  14, 2023

Respectfully submitted,

*Christopher Esbrook*

Christopher J. Esbrook (ARDC No. 6282829)
David F. Pustilnik (ARDC No. 6300609)
Heather A. Bartels (ARDC No. 6335536)
Esbrook P.C.
321 N. Clark Street Suite 1930
Chicago, Illinois 60654
(312) 319-7680
christopher.esbrook@esbrook.com
david.pustilnik@esbrook.com
heather.bartels@esbrook.com

24

FILED DATE: 8/14/2023 8:59 AM    2023L008072

*Attorneys for Plaintiffs*