| | | |
|---|---|---|
| ADRIAN SANTIAGO, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2024-CV-2058 |
| | ) | |
| v. | ) | Judge Mary M. Rowland |
| | ) | |
| NORTHWESTERN UNIVERSITY, | ) | Magistrate Judge Gabriel A. Fuentes |
| JAMES THOMAS FOSTER, MONIQUE | ) | |
| HOLLAND, and RACHEL VELEZ, | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED COMPLAINT

Plaintiff Adrian Santiago ("Santiago"), by and through his undersigned counsel, Esbrook P.C., for his amended complaint against Defendants Northwestern University ("Northwestern"), James Thomas Foster ("Foster"), Monique Holland ("Holland"), and Rachel Velez ("Velez") (collectively "Individual Defendants", and together with Northwestern, "Defendants") states as follows:

## NATURE OF THE ACTION

1.      This action arises out of Northwestern and the Individual Defendants' collective failure to address the sustained environment of toxicity, abuse, and harassment that the Plaintiff suffered throughout the 2022–2023 baseball season at Northwestern—particularly at the hands of Northwestern's former Head Baseball Coach, Jim Foster.

2.      Northwestern's negligent hiring of Foster, as well as the Defendants' continued failures to stop the mistreatment of its employees and students by Foster, are well-documented. Defendants had constructive, if not actual, knowledge of Foster's past misconduct due to the wealth of public information and internal resources with knowledge of Foster available to them,

and they refused to perform the proper due diligence prior to their hiring of Foster. Despite the Plaintiff repeatedly telling the Defendants, including numerous staff members within its Athletic and Human Resources ("HR") departments, about Foster's reckless flouting of NCAA Rules as well as the abusive, toxic, and dangerous environment created by Foster, the Defendants continued to protect Foster rather than its staff and student-athletes.

3.     The negligent hiring of Foster and the outrageous mishandling of the investigation into Foster's misconduct (including Foster's habitual and well-documented flouting of NCAA and Northwestern Rules and Regulations) after he was hired led to baseball program staff members Christopher M. Beacom ("Beacom"), Michael Dustin Napoleon ("Napoleon"), and Jonathon R. Strauss ("Strauss") being stripped of their titles and assigned remote contract work to avoid early termination of their employment at Northwestern.

4.     With these departures, Plaintiff was forced to entirely take over all three vacant positions and was offered little to no compensation in return.

5.     All Plaintiff received in return was the incessant abuse and exploitation of his position by Jim Foster, which the Defendants actively chose to ignore and disregard.  As a result, Plaintiff was compelled to resign from what was effectively his dream position with a prestigious Division I collegiate baseball program.

6.     Plaintiff continues to be stigmatized amongst the Division I collegiate baseball community, causing severe reputational harm because of his association with Foster's toxic and unethical program.

7.     Northwestern not only breached its obligations to compensate the Plaintiff properly, but is further liable, along with the Individual Defendants, to the Plaintiff for the negligent hiring and supervision of Foster. Additionally, given Foster's own illegal and tortious

conduct, Northwestern is also liable for the acts of Foster, its former employee, through the doctrine of *respondeat superior*.

## PARTIES

8.      Santiago resides in St. Louis, Missouri. He is the former volunteer Assistant Baseball Coach at Northwestern.

9.      Northwestern is a comprehensive research university with its principal place of business located at 633 Clark Street, Evanston, IL 60208.

10.     On information and belief, Foster is an Illinois resident. He is the former Head Baseball Coach at Northwestern.

11.     Holland is an Illinois resident. She is currently Deputy Director of Athletics (Chief of Staff) at Northwestern.

12.     Velez is an Illinois resident. She is currently Associate A.D. for Human Resources at Northwestern.

## JURISDICTION AND VENUE

13.     Jurisdiction is proper in this Court under 735 ILCS 5/2-209 because Northwestern's principal place of business is in Cook County, Illinois, and because the Defendants transact business within Illinois, have committed tortious conduct in Illinois, make and perform contracts substantially connected to Illinois, and maintain continuous and systematic contacts in Illinois.

14.     Venue is proper in the Circuit Court of Cook County, Illinois, under 735 ILCS 5/2-101 because Northwestern's principal place of business is in Cook County, Illinois and the facts and circumstances giving rise to the claims asserted herein occurred substantially in Cook County, Illinois.

## FACTS

15.    In June 2022, Northwestern hired Foster as Head Baseball Coach.

16.    Northwestern invited Foster to join its staff after six years at the United States Military Academy at West Point ("West Point")—prior to and during which time he developed an established and well-known reputation as a bully and a rule-breaker.

### *Foster's Hiring*

17.    Northwestern hired Foster despite his departure from West Point for allegations of abuse and misconduct made against him by student-athletes at West Point, allegations that were apparent upon a proper investigation and vetting of Foster prior to his being hired by Northwestern.

18.    Even before Foster's tenure at West Point, Foster had a troubled reputation. During his tenure as Head Coach of the baseball team at the University of Rhode Island from 2006-2014, the University of Rhode Island was sued for the wrongful death of a pitcher who died as a result of an outdoor strength and conditioning session. The lawsuit was settled for $1.45 million in 2016.[1]

19.    Notably, Foster did not appear to be a candidate for Northwestern's head coaching position in the first instance.

20.    During the initial hiring process, Holland asked the Head of Sports Information, Paul Kennedy, to create three press releases for three different head coaching candidates that Northwestern was considering, none of which were Foster. Approximately 10 days later, Holland instead told Kennedy to prepare a press release naming Foster as the Head Baseball Coach.

21.    Later, Foster explained that the process for interviewing and hiring Foster all occurred in a span of three to four days.

---

[1] https://www.providencejournal.com/story/news/courts/2016/01/28/uri-insurer-reach-145m-settlement-with-family-of-athlete-who-died-during-workout/32593673007/

22.     In the typical hiring of a coach at Northwestern, a finalist would have meetings with representatives from the academic, compliance, and medical arm of Northwestern's Athletic Department to provide an opportunity to ask questions of and gain important background information for each finalist candidate. On information and belief, in the case of Foster, none of these important meetings took place, which would have provided an opportunity to gain further background information on Foster. On information and belief, Velez also did not meet with Foster before his hiring, which was part of her job as the Associate A.D. for Human Resources at Northwestern.

23.     Foster was not one of the three options Northwestern was initially considering, and on information and belief, he was insufficiently vetted and hired in a rushed and inadequate process.

24.     Northwestern also had valuable access to information about Foster from other individuals already within the Northwestern Athletic Department who had previously worked with Foster, including: Russell Payne (Northwestern's Men's Soccer Coach) and Jenn Schumacher (Northwestern's Mental Performance Coach), both of whom previously were staffed at West Point at the same time as Foster, and who easily could have offered insight into Foster's coaching abilities, personality, and reputation.   On information and belief, Northwestern did not seek consultation from either of these individuals.

25.     Similarly, Northwestern's Head Women's Softball Coach, Kate Drohan and Foster were student athletes together at Providence College.   Given that the baseball and softball programs at university level typically work closely with one another, Drohan—like Payne and Schumacher—may have offered valuable insight into Foster's personality and fitness for the head

coaching position. Again, on information and belief, Drohan was not consulted by Northwestern's administration.

26.     Indeed, the baseball community at the collegiate level is small and close-knit, and most knew about Foster and his reputation, and despite this wealth of resources available—even within Northwestern—the Defendants refused to perform the proper due diligence and vetting of Foster prior to his hiring, and instead conducted a rushed and inadequate hiring process. Northwestern easily would have discovered Foster's reputation and past misconduct (assuming they did not know about it already and simply chose to ignore it) if they performed the necessary due diligence as part of a proper hiring process.

27.     Northwestern's hiring process of Foster has since been well-documented. Gragg and Holland allegedly conducted a "chaotic and unusual hiring process" and "pawned the hire off" to two Northwestern boosters. *See* https://www.insidenu.com/2023/7/10/23790160/jim-foster-accused-of-toxic-workplace-environment-nine-players-and-staffers-tell-670-the-score.

28.     The entire process of hiring Foster lasted only 3-4 days and was woefully inadequate and negligent. Given the amount of information and resources that were publicly available during the hiring process, Northwestern had, at the very least, constructive knowledge of Foster and his prior history. Instead, it chose to "pawn the hire off" to two boosters who clearly failed to conduct their research into Foster's adequacy and qualifications for the head coaching position.

***Plaintiff is Assigned the Tasks of Three Different Coaches/Staff Without Compensation***

29.     When Plaintiff started as a "volunteer coach" [2] in October 2022, it was agreed that he would be given duties and responsibilities that would require no more than 30 hours a week to fulfill.

30.     Plaintiff's initial responsibilities included: filling baseball camps, scheduling baseball camps, assisting with defensive infield work, and helping to identify recruits through phone calls with coaches. According to NCAA rules, Plaintiff as a "volunteer coach" could not speak directly with recruits, unless it was related to joining a camp, without permission from the NCAA through the grant of a weekly waiver.

31.     Beginning in November 2022, Foster began asking Plaintiff to assist in the recruiting of potential student athletes, duties which were clearly outside of those of a "volunteer coach." Foster regularly met with Plaintiff to discuss recruiting efforts and even asked him to set up calls with recruits.

32.     Plaintiff was performing the work of a "countable coach", all while still performing his required duties as a "volunteer coach."

33.     As Plaintiff's duties and responsibilities quickly began to expand outside those of a "volunteer coach" it was evident that he would require more than 30 hours a week to sufficiently fulfill his role.

---

[2] "The daily grind for volunteer assistant coaches can consist of extensive hours at the field or in the office, but their day doesn't end once they leave . . . . 'These guys are working full-time, 40-60 hours per week, and are unpaid. The money they receive comes from camps[]' . . . . [E]ven [the] extended hours for additional income outside of their coaching jobs don't help the volunteers live paycheck to paycheck or afford their rent in the areas they live." https://www.prospectslive.com/prospects-live/2021/12/6/the-life-of-volunteer-assistant-coaches. In November 2022, former Division I volunteer baseball coaches filed a lawsuit in the Eastern District of California "alleging the NCAA illegally limits not only the number of paid baseball coaches a team can hire, but also illegally price fixes a volunteer coach's salary at zero." https://frontofficesports.com/smart-v-ncaa-lawsuit/. In January 2023, the NCAA Division I Council "announced the incorporation of a third full-time assistant to college baseball staffs across the country, ending a bitter battle between volunteer coaches and the NCAA." https://www.baseballjournal.com/ncaa-d1-change-third-assistant-coach-can-now-be-paid/.

34.     Indeed, shortly after beginning as a "volunteer," Foster instead asked the Plaintiff to single-handedly manage program operations, pitching strategy, and recruiting. Each of these duties were intended to be handled by Beacom, Napoleon, and Strauss. With these three staff members no longer with the baseball program by February 2023 as a result of Foster's misconduct, the Plaintiff—still holding the title of a "volunteer" but with duties and responsibilities of multiple full-time coaches—was left to shoulder the entirety of these duties *alone*.

35.     In November 2022, Plaintiff worked approximately 40-50 hours per week, during which time a typical day would begin at 9:00 a.m. on location until 6:00 p.m. There were also baseball camps run by Foster attended by potential student athletes that took place during November, which required longer workdays (lasting from 9 a.m. until late in the evening). Plaintiff also worked extensive weekend hours beginning November 2022. Additionally, upon arriving home, Plaintiff would spend approximately 2 hours per night calling coaches and potential recruits.

36.     In January 2023, Plaintiff's role expanded even further, and he began working approximately 100 plus hours per week, with some days beginning at 9:00 a.m. and lasting until 8:30 p.m. Plaintiff assisted at practices every day, including some night practices, and also assisted with individual practice sessions.

37.     By February 2023, Plaintiff was not only working over 100 hours per week, but was eventually required to take on the roles of three different staff positions: Director of Baseball Operations, Recruiting Coordinator, pitching coach, and lead Assistant Coach. By this point, Plaintiff was shouldering the full load of making phone calls to potential recruits, requiring him to spend approximately five hours each night doing so, often until midnight, after having worked a full day.

38.     Specifically, when Napoleon left his role at Northwestern on February 15, 2023, Plaintiff was required to take on all of Napoleon's full-time job duties as a countable coach, which included: leading all recruiting efforts as the Recruiting Coordinator; ensuring that recruits were academically eligible; meeting with Janna Blais, the Deputy Director of Athletics regularly to review the grades of potential recruits; setting up phone calls with coaches to attend events; setting up the summer recruiting calendar; managing the transfer portal; reviewing potential scholarships and providing Foster with recommendations; working with hitters, developing and coordinating player programming, developing and coordinating practice plans, and working on defensive skills with infielders.

39.     When Strauss left his role at Northwestern on February 21, 2023, Plaintiff was required to take on all of Straus's full-time job duties as a countable coach, which included: keeping track of practice hours and submitting tracking logs every month; ensuring that that student athletes did not exceed the maximum number of Countable Athletically Related Activities (CARA) hours; developing and coordinating programming for pitchers; developing individual programming for student athletes; and assisting with recruiting.

40.     When Beacom left his role at Northwestern on February 21, 2023, Plaintiff was required to take on Beacom's full-time job duties, which included: arranging the Team's travel, lodging and meals; setting the Team's itinerary; and acting as a liaison between Foster and the Northwestern Athletic Department.

41.     After the departures of Napoleon, Beacom, and Strauss, Plaintiff was the only person performing the duties of these three full-time staff positions, two of which were "countable coaches."

42.     Northwestern hired Dennis Cook on March 3, 2023 and Brian Anderson on March 27, 2023 as replacements for Napoleon and Strauss. However, even after the hires of Cook and Anderson, Plaintiff continued to perform all three full-time staff positions. Neither Cook nor Anderson had any previous Division I college coaching experience, requiring Plaintiff to not only take on an additional role to train and educate Cook and Anderson, but also to continue to perform the job duties of Napoleon, Beacom and Strauss through the end of the season in June 2023.

43.     Although Anderson was named the Recruiting Coordinator upon being hired, he was not performing any of the duties associated with that role because he was still being trained by Plaintiff and Foster did not want any drop off in recruiting activities. As a result, Anderson simply shadowed Plaintiff for the remainder of the season. Plaintiff performed (and would continue to perform until the end of the season) all the duties and responsibilities of the Recruiting Coordinator, even though that was not his title.

44.     After Cook was hired and joined the staff, it was planned that he would assist with recruiting duties, particularly when the team was on the road, but because of Cook's inexperience, Foster concocted an excuse that Cook should not be allowed to travel to recruit and scout players because of a medical condition and continued to insist that Plaintiff handle all recruiting duties through the end of the season.

45.     Plaintiff's 100 plus hour workweeks continued for the remainder of the season, from February through June 2023, during which time the Baseball Team either had a game or a practice on most days.

46.     Plaintiff made numerous attempts to inform Velez about what was happening with the team, Foster's ongoing exploitation of Plaintiff's position, and the negative impact of Foster's behavior.

47.     For instance, on March 13, 2023, Plaintiff told Velez that he was "super frustrated with everything that's going on [at Northwestern] and sometimes [he] just can't keep not saying anything or holding it in or taking it home" to which Velez responded that "[i]t's okay, [she] signed up for this and offered it to [him]. And [she stood] by that." Velez once again confirmed on March 17, 2023 that she could "handle being the one [he] vent[ed] to or [got] frustrated with". As a result, the Plaintiff continued to inform Velez of the team environment and Foster's behavior, including on or around March 30, 2023, when he texted Velez that he was "[w]earing 3 different hats at once right now" and "[a]lso training a coach that's never written a scouting report or used team works or excel so".

48.     Still, Northwestern did nothing.

***Foster's Abusive Conduct***

49.     As Head Baseball Coach, Foster had full autonomy over the baseball program, including the authority to fire personnel, approve sick leave, and, generally, handle all baseball program business.

50.     Unsurprisingly, from the very beginning of Foster's tenure at Northwestern, the Plaintiff and other staff were subjected to abuse and bullying by Foster while Northwestern continued to protect Foster—above the baseball staff, its student-athletes, and even its recruits. Specifically:

    a.  Foster exhibited volatile, unpredictable behavior with frequent blow-ups. On October 22, 2022, at the baseball program's "Pro Day"—an event where baseball scouts visit Northwestern to assess talent and professional athletes previously associated with the baseball program partake in alumni activities, Foster publicly

berated the Plaintiff in front of these visitors, telling him to "shut the fuck up" when announcing players to hit or pitch.

b. On or around November 15, 2022, when recruiting an African American player, Foster asked the staff: "If the kid was white, would you recruit him?" While the staff responded that they would, Foster stated that he would not.

c. Foster frequently yelled at staff members in profanity-laced tirades. For example, in response to the Plaintiff politely and professionally voicing his opinion on topics being discussed by the coaching staff, Foster was unprofessional and demeaned the Plaintiff on numerous occasions. For instance, on or around November 16, 2022, the Plaintiff asked Foster about recruiting obligations due to imminent changes in the NCAA rules for volunteer coaches and was told: "You have a fucking facility right there go use it . . . I had a kid in 1994 and made $4,000.00 for the year and made it work. Figure it out." When Napoleon attempted to move forward with the discussion by rescheduling the meetings, Foster yelled at Napoleon to "sit the fuck down because we [aren't] finished." Foster also yelled at Plaintiff, "do you have anything fucking else to say?" and to "shut the fuck up" then continued the meeting as if nothing had occurred.

d. On or around November 23, 2022, Foster attempted to manipulate and pit staff against one another, including in one conversation telling Plaintiff not to become close with Strauss, Beacom, and Napoleon, all of whom had seemingly fallen out of favor with Foster, because "those guys could dig their own graves if they wanted."

e.  On March 30, 2023, during a moment in which Plaintiff did not have his laptop opened on a bus ride to West Lafayette, Indiana, Foster yelled at Plaintiff to "wake the fuck up and get to work." Foster yelled this in front of the team, student manager, and Mark Wesoloski ("Wesoloski"), Associate A.D. for Ticket Operations and Sports Administrator.

f.  On April 4, 2023, Foster exhibited extreme paranoia before Plaintiff and the team boarded a bus to play Notre Dame. Foster asked Plaintiff to confirm that the families of players committed to joining Northwestern's team had tickets to attend the upcoming weekend games. When Plaintiff started to work on the tickets using his phone, Foster told him to "put [his] fucking phone away" and berated him for focusing on recruiting. Afterward, the team loaded the bus and Plaintiff stepped off to ask Wesoloski to upload the tickets to the team's software. When Plaintiff returned onto the bus, he was repeatedly asked by Foster what he was discussing with Wesoloski. Instead of accepting the clear-cut answer—tickets for committed players and their families—Foster told Plaintiff to "get off the bus" and proceeded to scold him in front of Wesoloski. Foster was concerned that Plaintiff was complaining to Wesoloski about his behavior. When Wesoloski confirmed the topic of conversation related to tickets, Foster stated "it's my ass on the line, I just want to make sure the kids are taken care of." Wesoloski observed Foster's treatment of the staff and student-athletes throughout the season—and did nothing.

g.  Foster approached a student-athlete during a high school weekend camp to give advice on how to pitch and referred to a batter he faced as the "Chinese kid."

h.  Foster stated that he did not want the female team manager on the field because he did not want "the guys staring at her ass."

i.  Foster created such a toxic environment that staff members felt too uncomfortable to go the lunchroom because they would have to interact with Foster—causing them severe anxiety and stress.

j.  Foster frequently yelled at staff members in profanity-laced tirades telling them, for example, to "just fucking answer [his] question."

k.  On November 17, 2022, at a staff meeting in the Mogentale Players' Lounge, Foster yelled at Plaintiff that he "could fucking leave right now if [he didn't] like it" and when Napoleon tried to help deescalate the situation, he was told by Foster that "I don't need a fucking referee."

l.  Foster repeatedly asked staff members to violate NCAA, Big 10, and Northwestern rules, including meeting with underage players and conducting unofficial visits and recruiting and working out with players outside of the permitted time.

m.  Foster put student-athletes at risk by attempting to deny them appropriate medical care.

51.  Dr. Derrick Gragg ("Dr. Gragg") and Monique Holland ("Holland") remained completely uninvolved until a physical altercation almost occurred between Foster and Strauss. When Strauss complained to Holland that she was not protecting the staff and student-athletes, Holland told him to "grow up" and to respect Foster's authority.

52.  Holland refused to meet with any of the coaches individually except for Foster, who often used Holland as a conduit to communicate with staff.

53.     On February 15, 2023, Foster realized that Napoleon was taking personal leave. Foster told the team on February 16, 2023, when the team was heading to the airport. Upon arrival at the airport, Foster told Plaintiff that Strauss and Beacom were rude at the meeting, and he would have liked to "drag their asses through the glass windows" of the Mogentale Players Lounge. Despite an administrator, Holland, being assigned to attend and monitor this trip, she was not around at the time Foster made this statement. Holland was only present on Friday, February 17.

54.     By February 18 and 19, 2023, after Holland left the trip, all hell broke loose in a dugout during a game. Foster would not allow Strauss to pull a pitcher who was over his pitch count. Foster demeaned Plaintiff, telling him, "I don't need a fucking referee" and to "mind your fucking business" when Plaintiff sought to defuse a heated exchange between Strauss and Foster. Foster removed Strauss from his role of managing pitchers and two days later both Beacom and Strauss were no longer with the team.

55.     That same day, Dr. Gragg confirmed that none of the three *paid* members of the baseball staff would be returning to the team and that Northwestern was in the process of hiring new coaches.

56.     In fact, Beacom, Strauss, and Napoleon became remote special contract workers at Northwestern in order to receive compensation for the remainder of their contracts. These dedicated members of the University ultimately lost their positions at Northwestern in June 2023 while Foster remained Head Baseball Coach.

57.     Foster also repeatedly asked staff members to violate NCAA and Northwestern rules and regulations, such as contacting and meeting with underage potential recruits and conducting unofficial visits, including:

a. **November 1, 2022** – The Baseball staff had a meeting with Northwestern's compliance department, and Foster questioned Beacom and Strauss as to why the meeting was being held. Strauss explained that it is standard practice for compliance to meet with the baseball staff once a semester or quarter. Foster insisted that Strauss was wrong, and an argument ensued over Foster's flouting of NCAA rules. Foster then yelled that he just wanted Strauss to "answer the fucking question". When the team's Sports Administrator Mark Wesoloski arrived at the meeting, Foster asked him the reason for the meeting, and Mr. Wesoloski offered the same answer provided by Strauss and Beacom. During the meeting with compliance representatives Jane Wagner and Spencer Dawson, Foster challenged them and was disrespectful and unprofessional. He stated, "How am I supposed to win with all these rules?"

b. **November 4-5, 2022** – Foster set up an illegal unofficial visit with a potential student athlete, even though Napoleon explained to Foster that it was against NCAA rules. The potential student athlete showed up at the baseball field at the direction of Foster, and Strauss had to explain to the potential student athlete that he was not allowed at the facility. The next day, the baseball staff brought a group of potential student athletes to the Northwestern football game against Ohio State University, and Foster was upset that staff had not placed the same potential student athlete from the day prior on the ticket pass list. Napoleon once again explained to Foster that it was against NCAA rules to put this potential student athlete on the ticket list because he was underage, and Strauss and Napoleon had to escort the potential student athlete and his father out of the facility.

c.   **November 18, 2022** – Foster asked Strauss to set up yoga workouts for potential student athletes during the recruiting "dead period"[3], and when he was notified that this was against NCAA rules, Foster became angry and asked if that was a "Jane rule" (referring to compliance officer Jane Wagner). Strauss explained that it was an NCAA rule.

d.   **December 5-7, 2022** – It was discovered that Foster made several calls to underage potential student athletes prior to September 1, 2022, which is the first allowable date for college coaches to initiate or engage in recruiting-related discussion under NCAA rules.

e.   **January 3, 2023** – A student athlete attended the first weight workout during the winter quarter, and Foster was told by the compliance department that the student athlete was supposed to be cut at the end of the Fall quarter. Foster complained that he did not want to cut him, but finally Janna Blais, Deputy Director of Athletics, ordered Foster that he must be cut in an email dated December 9, 2022. In a meeting with the student athlete later in the day, Foster blamed Napoleon for not informing him that the student athlete was cut from the team. Foster then told the student athlete that he was allowed to work out in the facility when the coaches were not present, which is against the Northwestern and NCAA rules.

f.   **January 18, 2023** – Foster gave baseball camp discounts to two potential student athletes in violation of NCAA rules.

---

[3] https://www.ncsasports.org/ncaa-eligibility-center/recruiting-rules/dead-period

g. **February 4, 2023** – Foster told Napoleon, "We need to be done with practice at 3pm today.  Tell Jon we are only allowed to practice 4 hours today.  I would like to go over but with all this compliance investigation going on, we can't."

h. **February 16, 2023** – Foster ordered Plaintiff to visit and scout a potential student athlete in Texas before a series at Texas State, but this was during an "NCAA Quiet Period,"[4] which forbids off-campus recruiting or visit to potential student athletes' high schools.  Fortunately, Plaintiff consciously disobeyed the order and did not violate the rule.

i. **February 23, 2023** – Strauss was informed by Spencer Dawson, Northwestern's Compliance Officer, that Foster was under NCAA investigation.

j. **March 2, 2023** – During a 4-hour bus ride from Dallas/Fort Worth International Airport to Ruston, Louisiana, Foster received an email from Spencer Dawson ("Dawson"), Director of Compliance, informing him that Northwestern was self-imposing sanctions for NCAA recruiting violations. Since Dawson's email listed names of players that Foster previously provided to Plaintiff for purposes of reviewing them for prospective recruitment, Foster turned to Plaintiff and asked him "how the fuck did they get these names." Foster stated that "this [was] his ass on the line" and "this [was] messing with food on [his] table." Plaintiff responded that he was unaware of how Northwestern's Compliance department received the names—resulting in Foster continuing to harass and yell at Plaintiff about "how the fuck they got this stuff." Not only did Foster repeatedly question Plaintiff about the player names for the entirety of the bus ride, but he continued to interrogate and

---

[4] https://www.ncsasports.org/ncaa-eligibility-center/recruiting-rules/quiet-period

harass Plaintiff about the information over the following months despite knowing that Santiago was not allowed to speak about the investigation being conducted by HR and Compliance.

k. **May 24, 2023** – Strauss and Napoleon were interviewed by members of the NCAA concerning the NCAA rule violations witnessed while working for Foster.

l. **July 7, 2023** – Plaintiff was finally similarly interviewed concerning the NCAA rule violations witnessed while working for Foster. To the best of Plaintiff's knowledge, there still has been no resolution to the NCAA investigation into Foster's repeated and egregious violations.

### *Northwestern's Botched Supervision and Investigation of Foster*

58. Separate and apart from the NCAA rule violations, on or around October 2022, Beacom, Napoleon and Strauss began the process of formally reporting Foster's misconduct to Northwestern. Beacom, Napoleon, and Strauss also informed HR that they had separately reported Foster to the NCAA for various NCAA violations.

59. In or around January 2023, Plaintiff met with Kevin Clark ("Clark") and Rachel Velez ("Velez") from HR to corroborate the timeline that the other staff members had provided in the investigation. At that time, Plaintiff informed Clark of his experience with Foster, including how his manipulative behavior gave him extreme anxiety. Plaintiff specifically told Clark that Foster was driving the baseball program into the ground and that no staff would remain if Northwestern did not make a change. Northwestern disregarded Plaintiff's comments and no change was made.

60. Northwestern also assigned each team a "sport administrator" to act as a liaison between the Athletic Department and the University. The baseball program's assigned

administrator was Mark Wesoloski.  Mr. Wesoloski's title is Associate Athletics Director for Ticket Operations.

61.    Mr. Wesoloski's duty as a sport administrator was to be present with the arrival of Foster as the new coach in order to ensure the program operated smoothly, and that Foster and his staff had what they needed. Mr. Wesoloski failed in his duty to supervise the environment in which the Plaintiff was working. He never came to a single practice. He was not accessible so that the staff or student athletes could meet or speak with him. Even after staff raised complaints about Foster in connection with both his abusive behavior and habitual flouting of NCAA Rules, Mr. Wesoloski was nowhere to be found.

62.    Instead, rather than performing his duty and working as a liaison for the baseball team, Mr. Wesoloski only performed his normal daily function overseeing ticket sales, game-day ticket operations and service and was not available as a critical resource.  As a result, Plaintiff had nowhere to turn, when he should have been able to turn to Mr. Wesoloski.

63.    While Beacom, Strauss, and Napoleon began the process of reporting Foster's behavior to Northwestern, Foster continued to exploit Plaintiff's position as a "volunteer coach". For example:

     a.    On or around December 15, 2022, Foster texted Plaintiff that he "[had] a check for [him], $1000 for Christmas so that [he could] buy presents for [his] girlfriend." The $1,000 "gift" was in fact an advance deducted from Plaintiff's work at a December 26–29, 2022 youth camp. Plaintiff was not aware of this payment structure until January 3, 2023, when his check was for $1,000 less what he was owed.

     b.    Plaintiff was required to report any financial losses to Northwestern when working camps. When Foster's wife gave a family friend a camp discount, Foster attempted

to prevent Plaintiff from reporting the loss to Northwestern, stating: "Oh, they'll pay us back." Northwestern requested information about the discount and Foster blamed his wife.

    c.    Foster often complained to Santiago and a student manager about the other coaches, stating that Napoleon and Beacom were "useless" and not doing their jobs. Meanwhile, Foster did not set up for camps, missed practices, and even went as far to miss a January 14, 2023 visit with professional athlete alumni.

64.    On or around February 23, 2023, Northwestern sent a letter to Beacom, Strauss, and Napoleon that summarized the outcome of an HR investigation and confirmed that Foster had engaged in conduct that violated university policy. In particular, the university found sufficient evidence to substantiate allegations that Foster engaged in bullying and abusive behavior in violation of Northwestern policies.

65.    Despite Northwestern having confirmed the allegations of Foster's bullying, derogatory comments, and toxicity in the workplace, it opted to support Foster as Head Baseball Coach for the entirety of the 2022–23 baseball season, thereby endorsing his outrageous conduct and leaving Plaintiff to bear the full extent of Foster's misconduct.

66.    Thereafter, Foster made explicit statements to the Plaintiff that he had the immediate opportunity to thrive as more than a "volunteer coach" with the team—and that he was intentionally still with the team. In particular, Foster assured the Plaintiff, "[w]e'd be great coaching together. If I didn't want you here, you wouldn't be here." Foster even stated, "[y]ou could be my first or second assistant."

67. Foster also continued to manipulate the Plaintiff into handling the responsibilities of each of the staff members who were no longer active in the program (Beacom, Napoleon, and Strauss), well beyond those of a "volunteer coach".

68. Plaintiff taking on every single responsibility of these former staff members meant that Foster had *one* person to bully and blame for anything and everything. For example:

   a. On March 3, 2023, during a game in Louisiana, Foster stripped Plaintiff of all pitching coach responsibilities because the team was losing.

   b. On March 10, 2023, during a game in St. Louis, Foster blamed Plaintiff for players being in the wrong position and told him to "shut the fuck up and bite his lip" if he tried to respond.

69. Not only was this abusive treatment acknowledged by the student-athletes on the team and all remaining staff members, but it was even recognized by coaches on opposing teams. In fact, both former Northwestern coaches and coaches who had prior experience working with Foster called Plaintiff to provide him with advice and support.

***Plaintiff Requests Support and Compensation, But is Ignored***

70. For his own sake and for the sake of the program, Plaintiff repeatedly reported the abuse to Velez. For instance, after the March 10, 2023 incident where Foster told Plaintiff to "shut the fuck up and bite his lip," he immediately contacted Velez to report the incident. Once again, Northwestern and Velez did nothing.

71. Through all of this, Plaintiff continued to be given the title of a "volunteer coach", while being fed assurances by Foster that Plaintiff could be hired next season.

72. Finally, in March 2023, Plaintiff took the initiative to approach Foster and Northwestern about receiving pay for the three full-time coaching jobs he was now performing.

73.     Foster initially told Plaintiff that he "was caught up in administrative bullshit," while Velez told Plaintiff that they were "working it out" with the NCAA.

74.     From the very beginning of Plaintiff joining the team, Foster requested that Plaintiff contact coaches that Plaintiff was acquainted with in order to obtain lists of potential recruits that Foster could set-up phone calls with.

75.     Foster knew that, per then-current NCAA policies,[5] Plaintiff performing this particular function was prohibited.

76.     Nonetheless, in a written communication from Foster to Northwestern's HR department, Foster admitted that "all things recruiting [was] subpar, [but] the volunteer coach [was] doing more than half of it."

77.     Foster and Northwestern were well-aware that Plaintiff, at Foster's direction, was performing duties and obligations beyond that of a "volunteer coach" under NCAA rules. It was incumbent upon the university to immediately address and rectify this issue by reclassifying the Plaintiff as a "countable coach"[6] under NCAA bylaws. As a "countable coach", the Plaintiff was due compensation for all of the work he had already been doing for the team.

---

[5] Under the 2022-23 NCAA Division I Council Legislation, "a volunteer coach is any coach who does not receive compensation or remuneration from the institution's athletics department or any organization funded in whole or in part by the athletics department or that is involved primarily in the promotion of the institution's athletics program (e.g., booster club, athletics foundation association)." "The [volunteer coach] is prohibited from contacting and evaluating prospective student-athletes off campus and may not perform recruiting coordination functions." Section 11.01.6 of the 2022-23 NCAA Bylaws specifically outlines the role of volunteer coaches, including recruiting restrictions. *See* https://ncaaorg.s3.amazonaws.com/governance/d1/legislation/2022-23/2022-23D1GOV_POPL2022-23.pdf. The recent change by the NCAA to remove the volunteer coach position and increase the number of paid assistant coaches was made in-part to "increase the number of coaches who can assist with recruiting activities." *See* https://www.ncaa.com/news/ncaa/article/2023-01-11/ncaa-division-i-council-modernizes-rules-coaching-limits.

[6] Notably, not only was Foster asking Santiago to complete recruiting tasks that are only authorized to be done by a "countable coach", but the task, in and of itself, was a violation of NCAA guidelines in that the types of calls that Santiago was being asked to facilitate were not authorized by NCAA rules. This only further demonstrates the toxic and misguided program that Foster sought to run.

78.     Foster and Velez ultimately determined that Plaintiff would only receive two payments of $5,000 on or around March 15 and April 15, 2023, for his performance of all three full-time coaching jobs—less than what any other coach or the Director of Operations made under their employment contracts.

79.     Additionally, Northwestern failed to compensate Plaintiff for the work that it knew he had been performing since coming on board as a "volunteer coach"—work that Northwestern and Foster assigned to a "volunteer" in direct violation of NCAA guidelines. This was done by Northwestern to avoid paying Plaintiff a full-time assistant's salary as required for staff who are performing tasks only legally assignable to "countable coaches."

80.     When Plaintiff inquired about how Northwestern determined his compensation, Velez responded, "[t]hat is the rate [they] as an administration decided on taking into account a number of different factors" such as "experience, skill sets, budget, market, etc." Velez even specified that "[w]hat is budgeted is not always what's offered. And really salaries or stipends of others are personal matters."

81.     At a mere $5,000 paid on just two occasions, Northwestern then added *another* full-time job responsibility onto Plaintiff's plate: training two new coaches with no collegiate coaching experience. This included teaching them how to use recruiting software and scouting technology.

82.     Velez was fully aware of this situation, with Plaintiff telling her directly that he was "training a coach that's never written a scouting report or used teamworks or excel." Again, Northwestern did nothing.

83.     One of these new coaches, Brian Anderson, even told Northwestern that he was willing to forgo his monthly pay of $8,500 for Plaintiff since Plaintiff was the one training him.

Yet, Northwestern refused to increase Plaintiff's second payment by a mere $3,500, instead maintaining his second—*and final*—payment at $5,000.

84.    In fact, as of the following month, Northwestern refused to pay Plaintiff even the $5,000 payment amount he had received in March and April 2023.

85.    Meanwhile, Plaintiff continued to handle each of his full-time responsibilities—those of an NCAA "countable coach"—with no pay, and in addition to his responsibilities as a "volunteer coach."

86.    Northwestern reaped the benefits of Plaintiff performing the work of multiple full-time countable coaches by having the actual hired "countable" coaches who were intended to perform the duties that Plaintiff was performing remain on site at Northwestern while Plaintiff, frequently on the road recruiting and scouting, did their jobs for free.

87.    Even worse, the nature and amount of job responsibilities prevented him from working any baseball camps to supplement his nonexistent income.

88.    Northwestern failed to provide Plaintiff with an employment contract that paid him for his full-time job responsibilities, instead, circumventing NCAA rules by improperly labeling him as a "volunteer" despite the multiple full-time jobs he was performing. Northwestern then used the absence of an employment contract as an excuse to avoid providing Plaintiff with access to essential resources—resources that nearly all staff and members of the Northwestern community have access to.

89.    For instance, when Plaintiff asked Velez to see a therapist for extreme anxiety he was experiencing caused by Foster's abusive conduct, Velez said she would look into it. Plaintiff never heard back.

90.     And because of his "volunteer" employment status, he was left out to dry with *no insurance* to cover fees needed to diagnose and treat the various mental health symptoms he was experiencing arising out of the toxic and unethical work environment created by Foster and Northwestern.

### *Foster's False Promises*

91.     At the end of the season, Foster communicated to Plaintiff that he could be the pitching coach moving forward. In fact, Foster explicitly told Plaintiff that he would be paid $100,000 as the pitching coach for the team.

92.     Meanwhile, Foster proceeded to contact former coaches to offer up the same position of pitching coach and recruiting coordinator, despite promising those exact duties to the Plaintiff.

93.     Foster's false promises were ultimately revealed when Plaintiff received a phone call from another candidate that Foster was recruiting, inquiring as to why Foster would think this individual would be interested in that type of role at Northwestern. It was obvious that Foster had no intention of making the Plaintiff a pitching coach at Northwestern for the 2023–24 season.

94.     Plaintiff could no longer endure such an abusive, toxic, and unethical work environment. At the end of June 2023, Plaintiff told Foster that he was leaving the program.

95.     Plaintiff also emailed Dr. Gragg, Holland, and Velez to inform them he could no longer work for Foster despite it being a "dream opportunity" to "represent [his] hometown school." In particular, Plaintiff informed them that, "[u]nfortunately, [he could not] work in the current environment and continually recruit kids . . . given how [he felt] about the direction [they were] going and not being able to get [himself] to sell a culture and vision of a head coach [he did]

not believe in." While it was a tough decision "considering all [his] family [are] here in Chicago," his "mental and physical health are something that . . . had to take precedent."

96.    Afterward, Holland and Dr. Gragg met with the players, and to no one's surprise, the vast majority of players confirmed that they wanted Northwestern to fire Foster.

### *Northwestern Finally Fires Foster*

97.    Spurred by the publication of an article and radio segment conducted by WSCR radio personality and journalist Danny Parkins[7], Northwestern finally decided to terminate Foster on July 13, 2023, three days after the highly-publicized firing of head football coach Patrick Fitzgerald with ensuing scrutinizing press coverage. Unfortunately, this was far too little, far too late. In the press release terminating Foster, Dr. Gragg stated as follows:

> "Nothing will ever be more important to Northwestern than providing its students a place that allows them to develop in the classroom, in the community, and in competition at the absolute highest level, and building a culture which allows our staff to thrive. This has been an ongoing situation and many factors were considered before reaching this resolution. As the Director of Athletics, I take ownership of our head coaching hires and we will share our next steps as they unfold."[8]

98.    Northwestern had every opportunity to do the right thing and actually "provide[] its students a place that allows them to develop in the classroom, in the community, and in competition at the highest level, and building a culture which allows [its] staff to thrive." It was warned about Foster repeatedly—both formally and informally—both before and after his hire.

---

[7]  https://www.audacy.com/670thescore/sports/sources-northwestern-baseball-accused-of-toxic-culture
[8]   https://www.espn.com/college-sports/story/_/id/38007877/northwestern-fires-baseball-coach-jim-foster-sources-say.

99.     Northwestern was informed, on numerous occasions, and even via a formal HR complaint, of the incredibly detrimental impact Foster's presence was having on Northwestern's program and culture. Still, Northwestern did ***nothing***.

100.     Dr. Gragg and the University were only forced to take action when these issues came to public light via multiple media outlets and litigation involving the Athletic Department.[9]

101.     As indicated by the twenty complaints—and counting—filed in Cook County, Illinois since the beginning of July 2023 in connection with Northwestern's football and volleyball programs, Northwestern has repeatedly demonstrated its failure to properly handle and resolve inappropriate and *harmful* conduct within its athletic community.[10]

102.     Northwestern has itself since recognized that the culture of its athletic department is severely damaged. On August 2, 2023, Northwestern took the drastic step of hiring former U.S. Attorney General Loretta Lynch to lead an investigation into the culture of its athletic department "following allegations of abusive behavior and racism within the football program and other teams."[11]

103.     Unfortunately, Ms. Lynch cannot undo the damage that has already been done.

104.     Plaintiff's reputation is now tainted due to being associated with Foster's toxic and unethical program. Plaintiff repeatedly pushed back on Foster's requests to break NCAA, Big 10, and Northwestern rules and regulations, but he eventually could no longer sit idly by and endure

---

[9] Unsurprisingly, recent filings in Cook County against Northwestern allege that Foster engaged in "bullying and abusive behavior towards students at Northwestern." *See, e.g.*, *John Doe 1 v. Northwestern University et al.*, Case No. 2023L007098, ¶ 35.
[10] *See* Circuit Court of Cook County, Illinois Case Nos. 2023L007098; 2023L007221; 2023L007226; 2023L007300; 2023L007396; 2023L007485; 2023L007499; 2023L007705; 2023L007707; 2023L007711; 2023L007712; 2023L007713; 2023L007898l; 2023L007904; 2023L007910; 2023L008183; 2023L008086; 2023L008858; 2023L008859; 2023L008860.
[11] https://apnews.com/article/loretta-lynch-northwestern-hazing-f8f19d4066e88bc7bf5705b42dae6e40.

further labor exploitation, abuse, and Foster's habitual rule-breaking. He was effectively forced to resign in good conscience and is now permanently associated with Foster's misconduct.

105. Northwestern is a Division I, Big Ten university with highly coveted positions in its athletic department. The Plaintiff was honored and excited to pursue his career as a top-talent baseball coach for such a reputable and impressive program.

106. Instead, the Plaintiff has been irreparably harmed and must salvage his reputation after the dismal 2022–23 Northwestern baseball season with Foster. Plaintiff now not only has to explain to future employers why he was forced to step away from his post at a prestigious university like Northwestern, but he must also try and explain away to future employers his unavoidable association with Foster's toxic and unethical program.

107. As a result, the Plaintiff was forced to return to the Division III university where he worked prior to Northwestern and must rebuild his reputation.

108. The severe, adverse impact of Northwestern and Foster's misconduct has permanently stained Plaintiff's work experience and professional reputation and stalled the trajectory of his once-promising career as a talented Division I baseball coach.

109. Northwestern not only failed to pay Plaintiff compensation that he is legally owed, but it is liable for the negligent hiring and supervision of Foster, allowing his toxic and unethical culture to persist at the expense of its staff and student athletes, including the Plaintiff.

## **Count I – Illinois Minimum Wage Law, 820 ILCS 105, *et seq.***

**(Northwestern)**

110.    Plaintiff incorporates and realleges the allegations of paragraphs 1 through 109 as if fully set forth herein.

111.    Despite being misleadingly labeled by Northwestern as a "volunteer", the Plaintiff was performing duties of a full-time employee of the University who expected, and was due, proper compensation.

112.    In particular, when the Plaintiff's job responsibilities and his duties vastly increased and expanded, he was assured that the University was looking into proper compensation for him.

113.    In particular, the Plaintiff was asked by Foster to single-handedly manage program operations, pitching strategy, and recruiting—the responsibilities of full-time, *paid,* countable coaches. This scope of work was previously handled by three members of the team: Beacom, Napoleon, and Strauss.

114.    Further, it was a violation of NCAA rules for the Plaintiff to perform certain functions as *just* a "volunteer coach"—he needed to be reclassified as a "countable coach" and employee of the University.

115.    Northwestern was aware that the Plaintiff was performing work far beyond that of a "volunteer coach" and simply assured him that the University was "working it out".

116.    Consequently, Plaintiff assumed the University would properly compensate him for his work as an employee at the University.

117.    Instead, Northwestern decided to compensate the Plaintiff a *total* of $10,000 for filling the role of three different full-time staff members, including two full-time countable coaches.

118.    Plaintiff was not properly compensated for the entirety of his employment at the University, from October 2022 to June 2023, because Northwestern required him to consistently work more than forty hours per week, yet he received no overtime pay as required by state and federal law.

119.    In particular, starting in November 2022, Plaintiff was working no less than 50 hours per week, which ultimately increased to no less than 100 hours per week beginning in January 2023 and remained at no less than 100 hours per week beginning in January 2023 through the end of the season in June 2023.

120.    Plaintiff even spent his weekends fulfilling new job responsibilities instead of earning income through other means (e.g. through scheduling baseball camps).

121.    Plaintiff is due proper compensation for his regular and overtime hours as an employee at Northwestern.

122.    WHEREFORE, Plaintiff prays that this Court enter judgment on Count I of the Complaint in his favor against Defendant Northwestern in an amount to be determined at trial in excess of $50,000, plus interest and attorneys' fees, and grant such other relief as this Court deems just and proper.

### Count II – Fair Labor Standards Act, 29 U.S.C 201, *et seq.* (Northwestern)

123.    The Plaintiff incorporates and realleges the allegations of paragraphs 1 through 109 as if fully set forth herein.

124.    The Plaintiff was an employee at Northwestern despite being erroneously labelled as a "volunteer".

125. After Beacom, Napoleon, and Strauss became remote workers, Plaintiff, as demanded by Foster and authorized by Northwestern, assumed their job responsibilities of operations manager, pitching coach, and recruiting coordinator.

126. Northwestern maintained control over Plaintiff's assignments and work as evident through Foster's directives to the Plaintiff and the University's power to change the Plaintiff's workload, position, and compensation. For example, Northwestern refused to raise his compensation by $3,500 in April 2023, from $5,000 to $8,500.

127. Plaintiff had little opportunity for profits besides the work that he was doing for Northwestern.

128. For example, the Plaintiff could not even work baseball camps on weekends for money because he was so inundated with work from his three unpaid positions with Northwestern. The Plaintiff was supplied all equipment and computer programs by Northwestern in order to perform his many job responsibilities.

129. Given Foster's assurances that the Plaintiff would have a countable coach position in the 2023–24 season, Plaintiff expected to stay with the Northwestern program for the foreseeable future. Foster even enticed Plaintiff by telling him that he could get paid $100,000 as a pitching coach the following season.

130. There was a strong degree of permanency to Plaintiff's employment with Northwestern, especially given Foster's assurances to the Plaintiff that Plaintiff could continue to coach with him.

131. By the Plaintiff agreeing to step into additional roles on the baseball team, Northwestern had the ability to complete the 2022–23 baseball season despite losing *three* paid staff members at the start of the season. Consequently, Northwestern Baseball was and continues

to be an integral member of the prestigious Big10 Conference despite Foster's misconduct threatening to "run the baseball program into the ground."

132. Northwestern, through both Foster and through Plaintiff's written and oral communications with Velez, was aware that the Plaintiff was performing work far beyond that of a "volunteer coach" and simply assured him that the University was "working it out".

133. Consequently, Plaintiff assumed the University would properly compensate him for his work as an employee at the University.

134. Instead, Northwestern decided to compensate the Plaintiff a *total* of $10,000 for filling the role of three different full-time staff members, including two full-time countable coaches.

135. Plaintiff was not properly compensated for the entirety of his employment at the University, from October 2022 to June 2023, because Northwestern required him to consistently work more than forty hours per week, yet he received no pay, let alone overtime pay, as required by state and federal law.

136. In particular, starting in November 2022, Plaintiff was working no less than 50 hours per week, which ultimately increased to no less than 100 hours per week beginning in January 2023 and remained at no less than 100 hours per week beginning in January 2023 through the end of the season in June 2023.

137. Plaintiff even spent his weekends fulfilling these job responsibilities of three full-time staff members instead of earning income through other means (*e.g.*, through scheduling baseball camps).

138. Simply put, the total amount paid to Plaintiff of $10,000 for the hours worked and job responsibilities performed is far below the minimum wage per hour in Illinois of $12.00–$13.00.

139. Plaintiff is due proper compensation for his regular and overtime hours as an employee at Northwestern.

WHEREFORE, Plaintiff prays that this Court enter judgment on Count II of the Complaint in his favor against Defendant Northwestern in an amount to be determined at trial in excess of $50,000, plus interest and attorneys' fees, and grant such other relief as this Court deems just and proper.

## Count III – Illinois Wage Payment and Collection Act, 820 ILCS 115, *et seq.* (Northwestern)

140. The Plaintiff incorporates and realleges the allegations of paragraphs 1 through 109 as if fully set forth herein.

141. The Plaintiff undeniably had an employment agreement with Northwestern. In particular:

  a. Northwestern *explicitly* assented to the Plaintiff's paid employment when Velez continuously told the Plaintiff that she was inquiring about his wages.

  b. Northwestern *explicitly* assented to the Plaintiff's paid employment when it paid him $5,000 on two occasions.

  c. Northwestern *implicitly* assented to the Plaintiff's paid employment when it required him to perform the duties and job functions of multiple, full-time, historically paid positions.

142. Therefore, Northwestern was required to pay the Plaintiff for his services within 13 days after the end of the pay period in which his wages were earned.

143. Northwestern, through Foster and through Plaintiff's written and oral communications with Velez, was aware that the Plaintiff was performing work far beyond that of a "volunteer coach" and simply assured him that the University was "working it out".

144. Consequently, Plaintiff assumed the University would properly compensate him for his work as an employee at the University.

145. Instead, Northwestern decided to compensate the Plaintiff a *total* of $10,000 for filling the role of three different full-time staff members, including two full-time countable coaches,

146. Plaintiff was not properly compensated for the entirety of his employment at the University, from October 2022 to June 2023, because Northwestern required him to consistently work no less than forty hours per week, yet he received no compensation, let alone overtime pay, as required by state and federal law.

147. In particular, starting in November 2022, Plaintiff worked no less than 50 hours per week, which ultimately increased to no less than 100 hours per week beginning in January 2023 and remained at no less than 100 hours per week beginning in January 2023 through the end of the season in June 2023.

148. Plaintiff even spent his weekends fulfilling new job responsibilities instead of earning income through other means (e.g. through scheduling baseball camps).

149. Simply put, the total amount paid to Plaintiff of $10,000 for the hours worked and job responsibilities performed is far below the minimum wage per hour in Illinois of $12.00–$13.00.

150. Plaintiff is due proper compensation for his regular and overtime hours as an employee at Northwestern.

151.    To date, it is well beyond the end of *multiple* pay periods and Plaintiff has not been compensated anywhere close to the value of his services.

152.    WHEREFORE, the Plaintiff prays that this Court enter judgment on Count III of the Complaint in his favor against Defendant Northwestern in an amount to be determined at trial in excess of $50,000, plus interest and attorneys' fees, and grant such other relief as this Court deems just and proper.

### Count IV – Negligent Hiring
### (Northwestern)

153.    The Plaintiff incorporates and realleges the allegations of paragraphs 1 through 109 as if fully set forth herein.

154.    Employers, like Northwestern, have a duty to act reasonably in hiring and retaining employees. *Doe v. Coe*, 2019 IL 123521, ¶ 37, 135 N.E.3d 1, 13.  The initiation and existence of an employment relationship imposes a duty upon an employer, like Northwestern, to exercise reasonable care in employing only competent individuals. *Id.*  These duties are to all foreseeable individuals who might be impacted by the employee or his employment.  *Id.*

155.    Here, Northwestern owed a duty to Plaintiff to exercise reasonable care in employing a competent Head Baseball Coach.

156.    Due to the amount of information that was publicly available regarding Foster's past misconduct, the injuries suffered by the Plaintiff could have been avoided and were foreseeable to an employer of ordinary prudence in Northwestern's position.  Northwestern had actual knowledge, constructive knowledge, or both, that Foster was unfit for the job of Head Baseball Coach at Northwestern so as to create a danger of harm to Plaintiff, as well as to student-athletes and the University as a whole.

157. In particular, Northwestern had a duty to act reasonably by diligently vetting Foster prior to hiring him as Head Baseball Coach to confirm his competence.[12]

158. Immediately prior to his position at Northwestern, Foster faced allegations of abuse and bullying at Army West Point. In fact, there was even a "celebratory Zoom" when Foster left Army in summer 2022, and Army was in fact, "thrilled" to remove him.[13]

159. This is all information that was publicly available and readily accessible to Northwestern through basic internet searches and also through speaking with individuals already employed by Northwestern who knew and had worked with Foster at other universities where Foster was employed or attended—information that it either recklessly disregarded or failed to diligently obtain in its vetting process.

160. Even Foster himself has historically admitted to player abuse. For example, he openly "bragged" about students playing injured or sick on his watch.

161. In 2018, Foster referenced a pitcher's performance while injured—boasting about leaving him in for a pitch count that is recognized in the industry as alarmingly high even for healthy players, stating: "He was sick – pink eye, flu, or cold, something like that . . . He wasn't feeling good but he went out there and competed and threw 80 some pitches (actually 92 pitches, 58 of them strikes)."[14]

---

[12] Indeed, Northwestern has seemingly demonstrated an ongoing pattern of negligence, which continues to this day, in vetting its coaches. The problems arising out of the management of Northwestern's football program by the administration under Coach Pat Fitzgerald are well documented. Upon firing Mr. Fitzgerald, Northwestern hired David Braun as interim Head Football Coach on July 14, 2023, providing a news release that Coach Braun had previously obtained a master's degree in sports management and educational leadership. This was later reported to be an utter fabrication, and just another example of Northwestern failing to conduct its due diligence on an important athletic hire. *See* https://www.chicagotribune.com/sports/college/ct-david-braun-northwestern-university-football-20230721-6uiijbjmzfa37fgs5b3xo3kypi-story.html.

[13] https://www.insidenu.com/2023/7/10/23790160/jim-foster-accused-of-toxic-workplace-environment-nine-players-and-staffers-tell-670-the-score

[14] https://www.kitsapsun.com/story/sports/columnists/terry-mosher/2018/06/26/terry-mosher-north-masons-burggraaf-pitched-tournament-army/732548002/.

162. Foster's callous comments in 2018 were covered by the press. *See* https://www.kitsapsun.com/story/sports/columnists/terry-mosher/2018/06/26/terry-mosher-north-masons-burggraaf-pitched-tournament-army/732548002/.

163. Foster was also the head baseball coach at the University of Rhode Island when a baseball player died after a team workout—ultimately resulting in a settlement between the family and the University.[15] This settlement was publicized through numerous media outlets and made national news years before Northwestern's hiring of Foster. *See, e.g.*, https://www.providencejournal.com/story/news/courts/2016/01/28/uri-insurer-reach-145m-settlement-with-family-of-athlete-who-died-during-workout/32593673007/. The death purportedly occurred as a result of Foster's severe mismanagement and callous disregard for the health of his student-athletes.[16] All of this was information that was readily obtainable by Northwestern through basic background checks and proper vetting, which gave Northwestern constructive, if not actual, knowledge of Foster's past conduct.

164. It should have come as no surprise that Foster continued this behavior at Northwestern. Yet when the Plaintiff, among other coaches and staff, corroborated concerns of NCAA violations, player abuse, and disregard for injuries, Northwestern did not speak to a single player to substantiate their allegations.

165. As a result, a pitcher was needlessly injured during the season and was forced to undergo surgery. This is just one example of Northwestern's negligence in both hiring Foster and retaining him after a multitude of allegations to the NCAA and the University—allegations that

---

[15] https://www.boston.com/news/local-news/2016/01/29/university-of-rhode-island-settles-lawsuit-in-baseball-players-2011-death/.
[16] https://www.insidenu.com/2023/7/10/23790160/jim-foster-accused-of-toxic-workplace-environment-nine-players-and-staffers-tell-670-the-score.

Northwestern was ultimately [albeit belatedly] able to substantiate via its own internal investigation.

166. Despite the numerous internal resources with knowledge of Foster's reputation and conduct, and the numerous publicly available sources of information on Foster's past misconduct, Northwestern breached its duty of care and negligently hired and retained Foster as Head Baseball Coach for the entirety of the 2022-23 season, to the detriment of not only the Plaintiff, but also the student-athletes and the University as a whole.

167. Northwestern granted Foster the authority as Head Baseball Coach to manage the baseball team and staff—including the authority to make decisions on staff retention and set policy. As a result, Foster acted as an alter ego of Northwestern, and in particular, its baseball program.

168. For example, on March 3, 2023, during a game in Louisiana, Foster stripped Plaintiff of all pitching coach responsibilities because the team was losing.

169. Foster—unlike any other staff members—also had the authority to add responsibilities to Plaintiff's growing list of concurrent positions.

170. For example, Foster pressured Plaintiff to handle recruiting, operations, and pitching coach responsibilities after Beacom, Napoleon, and Strauss were stripped of their titles.

171. Unfortunately, Foster's conduct was not surprising to Plaintiff given his history and reputation in the field, as well as the multitude of concerns and complaints raised by staff at Northwestern.

172. As a result, Plaintiff's career as a Division I collegiate baseball coach has been stalled and his professional reputation has been permanently damaged due to an association with Foster's toxic and unethical program.

173.    In fact, the Plaintiff was forced to take a step backward—by returning to the same exact Division III position and title he held prior to Northwestern—despite applying to numerous other Division I programs.

174.    As a direct and proximate result of Northwestern's hiring and retention of Foster, Plaintiff suffered and will continue to suffer damages, including: losing his dream job representing his hometown school near his family; loss of potential income and job opportunities; being stigmatized and suffering extensive reputational damage due to an association with Foster and his toxic and unethical program; and an inability to find employment as a Division I collegiate baseball coach--a field of work in which he has been a part for many years.

175.    WHEREFORE, the Plaintiff prays that this Court enter judgment on Count IV of the Complaint in his favor against Defendant Northwestern in an amount to be determined at trial in excess of $50,000, plus punitive damages, and grant such other relief as this Court deems just and proper.

### COUNT V – Negligent Supervision
### (Northwestern, Holland, Velez)

176.    The Plaintiff incorporates and realleges the allegations of paragraphs 1 through 109 as if fully set forth herein.

177.    An employer, like Northwestern, has a duty to generally supervise its employees to make sure that they engage in appropriate behavior and follow the law and employer's rules. *Doe v. Coe*, 2019 IL 123521, ¶ 59, 135 N.E.3d 1, 16.

178.    As Head Coach of the baseball team, Foster was in a position of authority over baseball staff members and had complete control over the policies and procedures of the team. As a result, Foster acted as an alter ego of Northwestern, and in particular, its baseball program.

179.     Here, Northwestern (as Foster's and Plaintiffs' employer) and Holland, and Velez (as Northwestern's representatives and Foster's and Plaintiffs' superiors) owed Plaintiff a duty to exercise reasonable care and caution in the supervision of Northwestern's employee, Foster.

180.     These Defendants each had a duty to supervise and train Foster in his role as Northwestern's Head Baseball Coach, and to ensure that Foster was engaging in appropriate behavior and following the law and Northwestern's rules.

181.     The Northwestern Staff Handbook describes unacceptable behavior in the workplace: "Demeaning, intimidating, bullying, or violent behaviors that affect the ability to learn, work, live in the Northwestern environment depart from the standard for civility and respect. These behaviors have no place in the academic community." https://hr.northwestern.edu/documents/nu_staff_handbook.pdf, at 3.1.

182.     The Northwestern Staff Handbook further states that, "Faculty and staff at all levels are expected to support compliance with applicable Northwestern policies and procedures as well as applicable laws, rules, and regulations and to set a tone of intolerance for noncompliance." *See* https://hr.northwestern.edu/documents/nu_staff_handbook.pdf, at 3.2.

183.     These Defendants each breached their duty of care when they failed to ensure that Foster was not engaging in "unacceptable behavior", both generally and as detailed in the Northwestern Staff Handbook.

184.     These Defendants further breached their duty of care when they failed to ensure that Foster was supporting compliance with the NCAA rules and regulations, thereby failing to set a tone of intolerance for noncompliance as required by the Northwestern Handbook.

185. These Defendants failed to curb Foster's abusive and inappropriate behavior, as well as culture of noncompliance with NCAA rules, which were all in violation of Northwestern's Staff Handbook, despite the Defendants' long-standing knowledge of the same.

186. These Defendants also failed to educate Foster on the negative impact of abusive/bullying behavior and rule-breaking, did not take any action to both sufficiently and substantially investigate Foster, and to terminate Foster for his conduct, despite Plaintiff's complaints, Beacom, Napoleon, and Strauss's formal HR complaint, and their continuous pleas to HR to take action.

Defendants' breaches of supervision were negligent in one or more of the following ways:

   a. Defendants knew, and were told on multiple occasions, that Foster created an abusive and toxic workplace environment.

   b. Defendants knew or should have known that their failure to properly train and supervise Foster regarding policies against bullying would pose a high probability of serious harm to staff and student athletes, including Plaintiff.

   c. Were otherwise negligent in their conscious disregard for the safety of their staff and student athletes, including but not limited to the Plaintiff.

187. Northwestern knew of, and allowed this misconduct, knowing that it would continue to irreparably harm the Plaintiff.

188. As a result, the Plaintiff's career as a Division I collegiate baseball coach has been stalled and his professional reputation has been permanently damaged due to an association with Foster's toxic and unethical program.

189.    In fact, the Plaintiff was forced to take a step backward—by returning to the same exact Division III position and title he held prior to Northwestern—despite applying to numerous other Division I programs.

190.    Unfortunately, Foster's conduct was not surprising to Plaintiff given his history and reputation in the field, as well as the multitude of concerns and complaints raised by staff at Northwestern.

191.    As a direct and proximate result of Northwestern's negligent supervision of Foster, Plaintiff suffered and will continue to suffer damages, including: losing his dream job representing his hometown school near his family; loss of potential income and job opportunities; being stigmatized and suffering extensive reputational damage due to an association with Foster and his toxic and unethical program; and an inability to find employment as a Division I collegiate baseball coach--a field of work in which he has been a part for many years.

WHEREFORE, the Plaintiff prays that this Court enter judgment on Count V of the Complaint in his favor against Northwestern, Holland, and Velez in an amount to be determined at trial in excess of $50,000, plus punitive damages, and grant such other relief as this Court deems just and proper.

**Count VI – Negligence**
**(All Defendants)**

192. The Plaintiff incorporates and realleges the allegations of paragraphs 1 through 109 as if fully set forth herein.

193. The employer-employee relationship gives rise to a duty on the part of an employer to provide a safe place for their employees to work. *Allendorf v. Redfearn*, 2011 IL App (2d) 110130, ¶ 18, 954 N.E.2d 414, 419.

194. Defendants, as the employer and supervisors of the Plaintiff, owed Plaintiff a duty of care to provide a safe, non-toxic work environment during his time working for Northwestern.

195. In fact, the Northwestern Staff Handbook describes unacceptable behavior in the workplace: "Demeaning, intimidating, bullying, or violent behaviors that affect the ability to learn, work, live in the Northwestern environment depart from the standard for civility and respect. These behaviors have no place in the academic community." https://hr.northwestern.edu/documents/nu_staff_handbook.pdf, at 3.1.

196. The Northwestern Staff Handbook further states that, "Faculty and staff at all levels are expected to support compliance with applicable Northwestern policies and procedures as well as applicable laws, rules, and regulations and to set a tone of intolerance for noncompliance." *See* https://hr.northwestern.edu/documents/nu_staff_handbook.pdf, at 3.2.

197. Northwestern, Holland, and Velez each breached their duty of care when they did not take any action to timely and adequately curb Foster's conduct that was generally inappropriate and falls within the scope of "unacceptable behavior" in the Northwestern Staff Handbook.

198. Northwestern, Holland, and Velez each further breached their duty of care when they did not take any action to timely and adequately curb Foster's culture of noncompliance with NCAA rules and regulations, despite the requirement for Northwestern Staff to "support

compliance with applicable…rules, and regulations and to set a tone of intolerance for noncompliance."

199.     They further violated their duty of care by failing to both sufficiently and substantially investigate Foster, and to terminate Foster for his tortious conduct, despite Beacom, Napoleon, and Strauss's numerous reporting of Foster's NCAA rule-breaking, their subsequent HR complaint, and the Plaintiff's continuous pleas to Northwestern to take action.

200.     Foster breached his duty of care when, as Head Baseball Coach, he failed to ensure and protect the safety and well-being of his staff and student athletes, including failing to enforce Northwestern policies that prohibit inappropriate conduct such as rude, obnoxious, bullying behavior, and require staff members to "support compliance with applicable…rules, and regulations and to set a tone of intolerance for noncompliance."

201.     Foster further breached his duty of care by specifically and directly engaging in this wrongful conduct prohibited by the Northwestern Staff Handbook, including committing conduct that, by its very nature, is rude, obnoxious, bullying behavior, and by purposefully flouting and promoting and/or requesting noncompliance with NCAA rules and regulations.

202.     Unfortunately, Foster's conduct was not surprising to Plaintiff given his history and reputation in the field, as well as the multitude of concerns and complaints raised by staff at Northwestern.

203.     As a result, the Plaintiff's career as a Division I collegiate baseball coach has been stalled and his professional reputation has been permanently damaged due to an association with Foster's toxic and unethical program.

204. In fact, the Plaintiff was forced to take a step backward—by returning to the same exact Division III position and title he held prior to Northwestern—despite applying to numerous other Division I programs.

205. As a direct and proximate result of acts and/or omissions, Plaintiff suffered and will continue to suffer damages, including: losing his dream job representing his hometown school near his family; loss of potential income and job opportunities; being stigmatized and suffering extensive reputational damage due to an association with Foster and his toxic and unethical program; and an inability to find employment as a Division I collegiate baseball coach--a field of work in which he has been a part for many years.

206. As a direct and proximate result of Northwestern's hiring and retention of Foster, Plaintiff has been unable to obtain gainful employment at the Division I collegiate level.

WHEREFORE, the Plaintiff prays that this Court enter judgment on Count VI of the Complaint in their favor against Defendants in an amount to be determined at trial in excess of $50,000, plus punitive damages, and grant such other relief as this Court deems just and proper.

### Count VII – Willful and Wanton Conduct
### (All Defendants)

207. The Plaintiff incorporates and realleges the allegations of paragraphs 1 through 109 as if fully set forth herein.

208. Northwestern (as Foster's and Plaintiffs' employer) and Holland, and Velez (as Northwestern's representatives and Foster's and Plaintiffs' superiors) owed Plaintiff a duty to exercise reasonable care and caution in the hiring, retention, and supervision of Northwestern's employee, Foster.

209. Defendants, as the employer and superiors of the Plaintiff, owed Plaintiff a duty of care to provide a safe, non-toxic work environment during his time working for Northwestern.

210. Northwestern, Holland, and Velez each breached their duty of care when they did not take any action to timely and adequately curb Foster's conduct that was generally inappropriate and falls within the scope of "unacceptable behavior" in the Northwestern Staff Handbook.

211. Northwestern, Holland, and Velez each further breached their duty of care when they did not take any action to timely and adequately curb Foster's culture of noncompliance with NCAA rules and regulations, despite the requirement for Northwestern Staff to "support compliance with applicable…rules, and regulations and to set a tone of intolerance for noncompliance."

212. They further violated their duty of care by failing to both sufficiently and substantially investigate Foster, and to terminate Foster for his tortious conduct, despite Beacom, Napoleon, and Strauss's numerous reporting of Foster's NCAA rule-breaking, their subsequent HR complaint, and the Plaintiff's continuous pleas to Northwestern to take action.

213. Foster breached his duty of care when, as Head Baseball Coach, he failed to ensure and protect the safety and well-being of his staff and student athletes, including failing to enforce Northwestern policies that prohibit inappropriate conduct such as rude, obnoxious, bullying behavior, and require staff members to "support compliance with applicable…rules, and regulations and to set a tone of intolerance for noncompliance."

214. Foster further breached his duty of care by specifically and directly engaging in this wrongful conduct prohibited by the Northwestern Staff Handbook, including committing conduct that, by its very nature, is rude, obnoxious, bullying behavior, and by purposefully flouting and promoting and/or requesting noncompliance with NCAA rules and regulations.

215. Defendants' breaches were willful and wanton in one or more of the following ways:

a. Northwestern, Holland, and Velez knew, and were told on multiple occasions, that Foster created an abusive and toxic workplace environment and refused to take prompt and decisive action in response to these complaints in order to protect its staff and student athletes, including Plaintiff.

b. Northwestern knew or should have known, based on publicly available information regarding Foster's past misconduct, that its hiring of Foster would pose a high probability of serious harm to staff and student athletes, including Plaintiff.

c. Northwestern, Holland, and Velez knew or should have known, based on publicly available information regarding Foster's past misconduct and direct reporting of Foster's ongoing misconduct, that their failure to properly train and supervise Foster regarding policies against bullying and rule breaking would pose a high probability of serious harm to staff and student athletes, including Plaintiff.

d. Foster knew or should have known that abusing, cursing, and yelling at staff members would pose a high probability of serious harm to those staff members, including but not limited to Plaintiff.

e. Foster knew or should have known that exposing staff and student athletes to sexist, racist, and insensitive language and commentary would pose a high probability of serious harm to those staff members and student athletes, including but not limited to Plaintiff.

f. Foster knew or should have known that promoting staff to break NCAA and Northwestern rules and regulations would pose a high probability of serious harm to those staff members, including but not limited to Plaintiff.

g. Defendants were otherwise willful and wanton in their conscious disregard for the safety and wellbeing of their staff and student athletes, including but not limited to Plaintiff.

216. As a direct and proximate result of acts and/or omissions, Plaintiff suffered and will continue to suffer damages, including: losing his dream job representing his hometown school near his family; loss of potential income and job opportunities; being stigmatized and suffering extensive reputational damage due to an association with Foster and his toxic and unethical program; and an inability to find employment as a Division I collegiate baseball coach–a field of work in which he has been a part for many years.

WHEREFORE, the Plaintiff prays that this Court enter judgment on Count VII of the Complaint in their favor against Defendants in an amount to be determined at trial in excess of $50,000, and grant such other relief as this Court deems just and proper.

### Count VIII – *Respondeat Superior* (Alternative)
### (Northwestern)

217. The Plaintiff incorporates and realleges the allegations of paragraphs 1 through 109 as if fully set forth herein, and pleads the instant claim in the alternative.

218. Foster was an employee of Northwestern during the 2022-2023 baseball season.

219. Northwestern had the duty and authority to supervise, control, and prevent Foster's conduct, including promptly investigating his misconduct and terminating his contract for cause.

220. Foster's negligent, willful, and malicious acts toward his staff and players, and his open flouting of NCAA rules and regulations, occurred within the scope of his employment as Head Baseball Coach, including abusive yelling and cursing at staff, requesting staff to violate NCAA, Big 10, and Northwestern rules and regulations, excluding staff from meetings, and

discouraging players from seeking medical attention for injuries or potential injuries instead of attempting to prevent injuries.

221.     Northwestern is liable to Plaintiff through the doctrine of *respondeat superior* for the injuries suffered by Plaintiffs through Foster's negligent and willfully malicious performance of his duties as Head Baseball Coach,

WHEREFORE, the Plaintiff prays that this Court enter judgment on Count VIII of the Complaint in their favor against Defendant Northwestern in an amount to be determined at trial in excess of $50,000, and grant such other relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands trial by jury on all matters alleged herein so triable.

Dated: July 15, 2024

Respectfully submitted,

__/s/ Christopher Esbrook_____

Christopher J. Esbrook (ARDC No. 6282829)
David F. Pustilnik (ARDC No. 6300609)
James M. Kestler (ARDC No. 6322627)
Esbrook P.C.
321 N. Clark Street Suite 1930
Chicago, Illinois 60654
(312) 319-7680
christopher.esbrook@esbrook.com
david.pustilnik@esbrook.com
james.kestler@esbrook.com

*Attorneys for Plaintiff*